UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY ANN McBRIDE, et al.,

                Plaintiffs,            Civil Action No. 15-11222
                                          Honorable Sean F. Cox
v.                                     Magistrate Judge David R. Grand

MICHIGAN DEPARTMENT OF
CORRECTIONS, et al.,

                Defendants.
_____/

## REPORT AND RECOMMENDATION TO DENY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [15]

Before the Court is the motion for partial summary judgment filed on May 1, 2015, by the Michigan Department of Corrections ("MDOC") and six of its employees: MDOC Director Daniel Heyns, Deputy Director Thomas Finco, Chief Deputy Director Randall Treacher, Women's Huron Correctional Facility Warden Anthony Stewart, Chippewa Correctional Facility Warden Jeffrey Woods and Carson City Correctional Facility Warden Cathleen Stoddard (collectively "defendants").[1]  [15].  Plaintiffs Mary Ann McBride ("McBride"), Brian Wittman ("Wittman"), and Ralph Williams ("Williams") (collectively "plaintiffs"), all of whom are currently incarcerated, submitted a response to this motion on May 22, 2015. [23].  Defendants did not file a reply.  The matter has been referred to the undersigned for all pretrial matters

---

[1] Although defendants denominate the instant motion as one for summary judgment, they make a passing reference to "bring[ing] this motion under Fed. R. Civ. P. 12(b)(6) and 56(a)."  [15 at 2]. Since defendants submitted documents concerning "matters outside the pleadings," Fed. R. Civ. P. 12(d), the Court will solely consider the motion pursuant to the summary judgment standard.

pursuant to 28 U.S.C. § 636(b). [17].  The Court conducted a hearing with respect to the motion on September 17, 2015.

I.    **RECOMMENDATION**

For the reasons set forth below, **IT IS RECOMMENDED** that defendants' motion for partial summary judgment [**15**] be **DENIED**.

II.   **REPORT**

A.    **Background**

McBride, Wittman, and Williams are State of Michigan prisoners who, at all relevant times, were confined at the Women's Huron Valley Correctional Facility ("WVH") located in Ypsilanti, Michigan, the Carson City Correctional Facility ("DRF") located in Carson City, Michigan, and the Chippewa Correctional Facility ("URF") located in Kincheloe, Michigan, respectively. [1].  In general, plaintiffs assert that defendants have discriminated against them and/or violated their rights because they are either deaf or significantly hearing impaired.

More specifically, plaintiffs allege violations of: (1) Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") and its implementing regulations; (2) the Rehabilitation Act, 29 U.S.C. § 794, *et seq.* ("RA") and its implementing regulations; (3) the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.* ("RLUIPA"); (4) the Free Exercise Clause of the First Amendment to the United States Constitution (42 U.S.C. § 1983 – solely against the individual defendants in their official capacities); and (5) the Free Speech Clause of the First Amendment to the United States Constitution (42 U.S.C. § 1983 – solely against the individual defendants in their official capacities).  Plaintiffs seek injunctive relief, and will eventually seek class certification status on behalf of approximately 110 similarly situated inmates. [*Id.* at ¶ 103].

### B.    Relevant Facts

#### 1.    *Plaintiffs' Allegations*

The complaint's factual allegations center around five different areas: (1) inadequate access to telecommunications; (2) inadequate access to auxiliary aids and services; (3) inadequate visual notification of prison alerts and announcements; (4) ineffective communication during parole and disciplinary proceedings; (5) unequal treatment of deaf and hearing impaired inmates by prison officers. [*Id.* at ¶ 30].

Regarding access to telecommunications, plaintiffs maintain that MDOC telecommunication devices for the deaf ("TDDs") do not adequately assist them in remotely communicating with relatives because "[t]he TDD direct-messaging system works only if both the caller and recipient have access to a TDD device." [*Id.* at ¶ 38].  Plaintiffs also allege that MDOC charges them significantly higher rates for using TDDs than for traditional telephone calls. [*Id.*].  Also, some MDOC facilities, such as URF, do not have any TDDs, videophones, or telephone amplifiers. [*Id.* at ¶ 41].

Access to hearing aids, interpreter services and other assistive devices are supposedly limited as well.  According to Williams, MDOC officials at URF have denied his requests for an auditory evaluation of his right ear so that he could receive a hearing aid. [*Id.* at ¶ 53].  On other occasions, Williams asserts that MDOC officials placed him in solitary confinement without the use of his hearing aid. [*Id.* at ¶ 54].  Plaintiffs complain of significant delays in sending assistive devices out for repairs and obtaining necessary replacement parts. [*Id.* at ¶ 55-57].  Without the use of these devices, plaintiffs claim they are exposed to a heightened risk of danger from other inmates. [*Id.* at ¶ 59].  Plaintiffs also report that the availability of sign language interpreters is significantly restricted, and in some MDOC facilities, requests for these interpreters are routinely

denied or they are not provided at all. [*Id.* at ¶¶ 69-70].   Without these accommodations, plaintiffs' allege that their ability to obtain proper medical care, and utilize rehabilitative programs and religious services, is significantly diminished. [*Id.* at ¶¶ 67-77].

Plaintiffs also contend that MDOC facilities lack adequate visual notification systems for hearing impaired inmates and that the systems already in place "function poorly or are used only sporadically." [*Id.* at ¶ 82].   For instance, Wittman and Williams assert that housing units at DRF and URF do not have visual displays for posting announcements or warnings in case of emergencies. [*Id.* at ¶¶ 87-89].   McBride alleges that, although MDOC officials at WHV issued her a pager, she "has not received pages for emergencies or alarms such as fire drills" or the pages are received "too late to be of benefit." [*Id.* at ¶ 84].   Plaintiffs are then forced to rely on other inmates to receive emergency bulletins and announcements.

Plaintiffs also assert that inmates are required to appear at disciplinary proceedings without their hearing devices or sign language interpreters.   Plaintiffs reference an occasion where MDOC officials at URF allegedly denied Williams's request to use his hearing aid during a misconduct hearing, thereby rendering him unable to understand the charges against him or mount a competent defense.   The hearing resulted in his placement in solitary confinement for 40 days. [*Id.* at ¶ 95].   Similarly, MDOC officials at DRF allegedly denied Wittman's request for a sign language interpreter to appear with him during a disciplinary hearing. [*Id.* at ¶ 96].

Finally, plaintiffs maintain that they suffer unequal and improper treatment from MDOC officers because they are not properly trained to handle hearing impaired inmates.   For instance, they allege that officers have yelled at McBride and cited her for misconduct "when she fail[ed] to respond to instructions that she did not hear." [*Id.* at ¶ 99].   They have also allegedly mocked

her in front of other inmates and ignored her attempts to communicate with them by writing messages on notepads. [*Id.* at ¶ 100].

2.     *Defendants' Motion for Partial Summary Judgment*

In their motion for partial summary judgment,[2] defendants maintain that: (1) most of plaintiffs' claims should be dismissed because they failed to exhaust their administrative remedies prior to commencing the instant action; (2) MDOC has sovereign immunity against the Title II ADA claim under the Eleventh Amendment to the United States Constitution; (3) the RLUIPA claim is not cognizable because defendants have not imposed a "substantial burden" on plaintiffs' religious exercise; and (4) their failure to provide sign interpreters for religious services does not violate the Free Exercise Clause of the First Amendment to the United States Constitution.

**C.     Legal Standard**

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable

---

[2] Because defendants are not seeking dismissal of the Rehabilitation Act and free speech claims, they are, in actuality, moving for partial summary judgment. [23 at 1, n.2.].  This Report and Recommendation is captioned accordingly.

5

inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### D.    Analysis

#### 1.    Exhaustion

Defendants contend that most of the claims in this case are procedurally barred under the Prison Litigation Reform Act ("PLRA") because plaintiffs failed to exhaust their administrative remedies prior to commencing the instant proceeding. [15 at 5].

The PLRA requires prisoners challenging the conditions of their confinement under 42 U.S.C. § 1983 to first properly exhaust their available administrative remedies. 42 U.S.C. § 1997e(a) ("[n]o action shall be brought with respect to prison conditions under §1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see Jones v. Bock*, 549 U.S. 199, 220 (2007); *Porter*

6

*v. Nussle*, 534 U.S. 516, 532 (2002). The *Jones* Court held that "exhaustion is an affirmative defense, and prisoners are not required to specifically plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. The burden is on the defendant to show that the plaintiff failed to properly exhaust his administrative remedies before filing the action. *Id.*; *see also Kramer v. Wilkinson*, 226 F. App'x 461, 462 (6th Cir. 2007) (the "affirmative defense [of exhaustion] may serve as a basis for dismissal only if raised and proven by the defendants.").

In order to exhaust their administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules established by state law. *Id.* at 218-19. This requirement is a stringent one. In *Woodford v. Ngo*, 548 U.S. 81, 93 (2006), the Supreme Court held that the PLRA exhaustion requirement "requires proper exhaustion." "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90; *see Scott v. Ambani*, 577 F.3d 642, 647 (6th Cir. 2009); *Vandiver v. Corr. Med. Servs.*, 326 F. App'x 885, 888 (6th Cir. 2009).

Defendants specifically assert that plaintiffs failed to comply with MDOC Policy Directive ("P.D.") 03.02.130 (effective Jul. 9, 2007) entitled "Prisoner/ Parolee Grievances" by failing to include required information in the early stages of the grievance process (and in one instance, by filing suit before the grievance had received a ruling at the final Step III stage). [15 at 7]. Insofar as it is relevant to this case, P.D. 03.02.130 provides the following guidelines for filing prisoner grievances:

> "E. Grievances may be submitted regarding alleged violations of policy or procedure or unsatisfactory conditions of confinement which directly affect the grievant, including alleged violations of this policy and related procedures.
> . . .

P.  Prior to submitting a written grievance, the grievant shall attempt to resolve the issue with the staff member involved within two business days after becoming aware of a grievable issue, unless prevented by circumstances beyond his/her control or if the issue falls within the jurisdiction of the Internal Affairs Division in Operations Support Administration.  If the complaint is not resolved, the grievant may file a Step I grievance.  **The Step I grievance must be filed within five business days after the grievant attempted to resolve the issue with staff**.

* * *

R.  A grievant shall use the Prisoner/Parolee Grievance form (CSJ-247A) to file a Step I grievance; a Prisoner/Parolee Grievance Appeal form (CSJ-247B) shall be used to file a Step II or Step III grievance.  The forms may be completed by hand or by typewriter however, handwriting must be legible.  The issues shall be stated briefly but concisely.  Information provided shall be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how).  **Dates, times, places and names of all those involved in the issue being grieved are to be included**.

***

V.  Within five business days after attempting to resolve grievable issues with staff, a grievant may send a completed Prisoner/Parolee form (CSJ-247A) to the Step I Grievance Coordinator designated for the facility, field office or other office being grieved . . ."

[*Id.* at 8-9] (emphasis added).  The Court will evaluate defendants' exhaustion arguments as they relate to each of the Step III grievances filed by plaintiffs.[3]

> a.  *McBride*

McBride filed the following three relevant Step III grievances while incarcerated at WHV [*Id.* at 9]:

---

[3] In support of their exhaustion defense, defendants have attached the Step III grievance reports which list the grievances appealed to Step III by each plaintiff. [15, Exs. A-C].

8

| Grievance # | Subject Matter |
|---|---|
| 1) WHV-11-11-4707-06c ("06-c") | Failure to provide interpreter for religious services |
| 2) WHV-13-03-1391-03f ("03-f") | Failure to accommodate hearing disability with sign language interpreters and updated technology |
| 3) WHV-14-06-2356-06e ("06-e") | Supporting documents not submitted[4] |

Defendants argue that McBride did not exhaust these grievances for the following reasons:

- **Grievance 06c**: McBride solely named MDOC in this grievance without mentioning the remaining individual defendants in violation of P.D. 03.02.130 ¶ R.  Defendants propose that all of the claims stemming from this grievance should be dismissed in their entirety. [*Id.* at 9].

- **Grievance 03f**: Of the named defendants in this action, McBride solely named Heyns in this grievance, in violation of P.D. 03.02.130 ¶ R.  Defendants propose that all of the claims related to this grievance should be dismissed except as to Heyns. [*Id.* at 10].

- **Grievance 06e**: This grievance was still pending at the time plaintiffs filed the complaint. Defendants propose that all claims related to this grievance should be dismissed in their entirety. [*Id.*].

As for Grievance 03f, the Court finds that McBride satisfied the requirements of P.D. 03.02.130 ¶ R because she identified all of the relevant parties whom she reasonably could have known about at the time she filed this grievance. [15-2 at 14 ("This grievance is submitted against Warden Millicent Warren, MDOC Director Daniel Heyns, Regional Prison Administrator Bruce Curtis, Deputy Warden Osterhoust, Chaplin Mardini, DeAngel D. Johnson, G. Griffy, T.

---

[4] Although defendants attached supporting documentation for grievance WHV-12-10-5015-06e, which relates to MDOC's failure to evaluate McBride's hearing and provide her with hearing aids, they do not challenge this particular grievance on exhaustion grounds or for any other reason. [*See* 15-2 at 17-21; 23 at 10].  Defendants did not provide supporting documentation for grievance 06-e, though they describe it as relating to an alleged "Failure to provide hearing aids." [15 at 9].

9

Beard, T. Snipes, Luna, Health Unit Manager Jackson.")].  In their response brief, plaintiffs correctly note that:

> [t]he grievance does not identify Defendant Anthony Stewart, WHV's current warden, for the obvious reason that Defendant Stewart was not WHV's warden when the grievance was filed, and therefore was not involved in the issues grieved.  Nor does it identify Defendants Jeffrey Woods and Cathleen Stoddard because they are wardens of different prisons . . . and also were not involved in the issues grieved.

[23 at 8].

As to Stewart the analysis is fairly straightforward.  At the time of the alleged wrongful conduct, Millicent Warren (named in the grievance) was the warden at WHV.  However, at the time this action was filed, Stewart was the warden at that facility.  The fact that this personnel change occurred between the alleged wrongful conduct and the filing of the complaint cannot be used to preclude McBride from bringing her related claims.  A similar issue was recently addressed in *Argue v. Burnett*, No. 08-186, 2011 U.S. Dist. LEXIS 27139 (W.D. Mich. Jan. 18, 2011) *adopted by* 2011 U.S. Dist. LEXIS 27141 (W.D. Mich. Mar. 16, 2011).  There, the court confronted the more common situation where an inmate filed a Step I grievance against an MDOC official who later retired and was then, unbeknownst to the inmate, replaced by another individual prior to the filing of the complaint.  The MDOC official argued that he should be dismissed from the action because he was no longer "the proper party against whom the requested relief can be obtained. *Id.* at *16  But rather than dismiss the complaint, the magistrate judge recommended substituting the current officeholder in place of his retired predecessor, noting "[t]hat Plaintiff misidentified the name of the individual who then held that position is, in the Court's opinion, of no consequence." *Id.* at *19.  Ultimately, the district judge adopted this recommendation and did not bar the inmate from suing the current officeholder despite the fact

that he was not involved in the events underlying the Step I grievance and, thus, not named in the grievance or original complaint.  *Argue* is analogous to the instant case.  Because McBride properly identified Millicent Warren as the warden at WHV when she filed Grievance 03f, the Court sees no reason to preclude her claims against that facility's new warden on exhaustion grounds.

Defendants' arguments as to Stoddard and Woods are different, but equally lacking in merit.  Stoddard is being sued *by Wittman* exclusively for wrongful conduct that occurred at DRF, while Woods is being sued *by Williams* for wrongful conduct that exclusively occurred at URF.  Defendants are essentially asking the Court to find that *McBride's* claim, which has nothing to do with Stoddard or Woods, must be dismissed because her underlying grievance does not name either of those defendants.  Since Stoddard and Woods both had no connection to the issues that McBride grieved at WHV, she obviously had no reason to mention them in Grievance 03f and, thus, fully complied with P.D. 03.02.130 ¶ R.  As a result, the PLRA does not require McBride to exhaust her claims against Stoddard and Woods on account of the allegations in the complaint that solely pertain to her co-plaintiffs or other putative class members.[5]

Moreover, even assuming these purported errors would otherwise render Grievances 06c and 03f unexhausted, they are still ripe for judicial review because MDOC officials addressed the grievances on the merits.  *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010)

---

[5] Defendants' contrary view is untenable because it would require a plaintiff, in order to exhaust *her own claim* to: (1) correctly predict the identity of each future co-plaintiff and/or putative class member; (2) identify which MDOC officials were involved in each of the relevant Step I grievances filed by each such person; and then (3) name those MDOC officials in each of her own relevant Step I grievances (although many of these officials would have no connection to the issues being grieved).  Defendants cite no law requiring prisoner plaintiffs to possess such prescient powers.

11

(holding that the PLRA exhaustion requirement had been met when MDOC addressed an inmate's grievance on the merits although he did not name "all those involved in the issue being grieved."); *see also Maxwell v. Corr. Med. Servs.*, 538 F. App'x 682, 687-89 (6th Cir. 2013) (applying *Reed-Bey* where prison officials addressed the merits of the subject grievance).

The Court also agrees with plaintiffs that a material issue of fact exists concerning whether Grievance 06e remained pending at the time she commenced this lawsuit on March 31, 2015. [15 at 7]. At this point, the only evidence before the Court regarding this particular grievance is that McBride filed her Step III appeal on September 9, 2014, and that as of April 21, 2015 (the date of the Step III Grievance Report provided to the Court), that grievance had been "Denied" at Step III. [15-2 at 4]. The actual date of the Step III denial is not indicated on the report, and thus, defendants have not shown that it had not been denied at the time plaintiffs filed this action. Again, the Court notes that defendants did not append any documentation associated with Grievance 6e to their motion. Therefore, defendants have not sufficiently established that McBride failed to exhaust her administrative remedies as to Grievance 06-e before commencing this action.

b.    *Wittman*

Wittman filed two relevant Step III grievances while incarcerated at DRF. The grievance numbers and the subject matter of each grievance are listed in the table below [15 at 11]:

| Grievance # | Subject Matter |
|---|---|
| 1) DRF-14-01-0066-12i ("66-12i") | Failure to send cochlear implant for repairs |
| 2) DRF-13-07-1390-12i ("90-12i") | Failure to accommodate hearing disability with sign language interpreters and updated technology |

Defendants maintain that Wittman failed to exhaust these grievances for the following reasons:

12

- Grievance 66-12i: Wittman solely named "Head RN" in his grievance without mentioning any of the above-named defendants, in violation of P.D. 03.02.130 ¶ R. Defendants propose that all of the claims stemming from this grievance should be dismissed in their entirety. [*Id.* at 12].

- Grievance 90-12i: Wittman solely named defendant Heyns in this grievance without mentioning the remaining defendants in violation of P.D. 03.02.130 ¶ R. Defendants propose that all of the claims related to this grievance should be dismissed except as to Heyns. [*Id.*].

Here, the Court concludes that Wittman's Grievance 66-12i is ripe for judicial review under *Reed-Bey* since MDOC officials addressed the grievance on its merits. In addition, Grievance 90-12i satisfied the requirements of P.D 03.02.130 ¶ R because Wittman appropriately submitted this grievance "against Warden Willie Smith, MDOC Director Heyns, Regional Prison Administrator Bruce Curtis, ADA Coordinate Koenigsknecht, all unknown Deputy Wardens, and all unknown Shift Supervisors." [15-3 at 41]. As with McBride, at the time of the alleged wrongful conduct, Willie Smith (named in the grievance) was the warden at DRF. However, at the time this action was filed, Stoddard was the warden at that facility. The fact that this personnel change occurred in the interim cannot be used to preclude Wittman from bringing his related claims. *See Argue, supra*.

Similarly, with respect to Stewart and Woods, Stewart is being sued by McBride exclusively for wrongful conduct that occurred at WHV while Woods is being sued by Williams for wrongful conduct that exclusively occurred at URF. Since Stewart and Woods both had no connection to the issues that Wittman grieved at DRF, he obviously had no reason to mention them in Grievance 90-12i and, thus, did not violate P.D. 03.02.130 ¶ R. *See supra* at 11. Therefore, summary judgment is not warranted because defendants have not demonstrated that Wittman's claims are unexhausted.

13

c.      *Williams*

While incarcerated at URF, Williams filed one relevant Step III grievance which was related to the lack of a text/telephone system at the facility. [15 at 12]. Although Williams' grievance listed the "Date of Incident" as November 20, 2012 (the date he arrived at URF), the text of his initial grievance, which he submitted on October 28, 2013, made clear that his complaint related to an ongoing and then-present issue. [15-4 at 8]. The grievance stated, in relevant part:

> I wear a hearing aid and would like to be transferred to a facility that has a text/telephone system test/telephone device. When I arrived November 20, 2012, I was lead to believe the system was soon to be installed which of to date [it] hasn't. I would like to call my family with the same privileges as other inmates.

[*Id.*]. Williams also specifically wrote that, "I talk [*sic*] to healthcare on 10/23/13 about this matter, they told [*sic*] they did not know I had a hearing aid . . . I also talk to my ARUM, he told me healthcare would take care of this." [*Id.*].

Defendants assert that because Williams became "aware of a grievable issue" on November 20, 2012, when he first arrived at URF, his filing of the grievance on October 28, 2013, was untimely under P.D. 03.02.130 ¶ P. Consequently, defendants propose that all of the claims related to this grievance should be deemed unexhausted. This argument lacks merit.

First, affording all reasonable inferences to Williams, his grievance could be construed as relating to the denial of a request he made on *October 23, 2013*. Such an interpretation would make his grievance, filed on *October 28, 2013*, timely under P.D. 03.02.130 ¶ P. This version of events at least raises a genuine issue of material fact as to when Williams actually became aware that URF would not be receiving a TDD system and whether his Step I grievance was timely. Moreover, at the hearing, Williams' counsel confirmed that Williams is not seeking relief with

14

respect to any conduct prior to October 23, 2013 – the date he claims he "talk[ed] to health care." Finally, defendants' argument is flawed as it essentially seeks to impose a permanent waiver of claims of an ongoing or repetitive nature that are not raised when the very first instance of alleged wrongdoing occurs.  Defendants advance no support in the law for such a theory.  In sum, based on the record before the Court, defendants have not shown that Williams failed to exhaust his claims in this action.

### 2.    *Sovereign Immunity*

Defendants maintain that MDOC has sovereign immunity against the plaintiffs' Title II ADA claim pursuant to the Eleventh Amendment to the United States Constitution. [15 at 14]. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Unless an exception applies, MDOC, as a state agency, is immune from suit under the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, (1984); *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013).  The only exceptions to such immunity are where: (1) the state consents to the filing of such a lawsuit; or (2) Congress expressly abrogates Eleventh Amendment immunity. *Id.* (citing *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) and *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984)).  Since there is no dispute that the State of Michigan has not waived sovereign immunity against Title II ADA claims, the only question is whether Congress appropriately abrogated sovereign immunity in the Title II context.

To make this determination, the Court must answer the following questions: (1) "whether Congress unequivocally expressed its intent to abrogate [sovereign] immunity;" and (2) "if it did,

whether Congress acted pursuant to a valid grant of constitutional authority." *Lane v. Tennessee*, 541 U.S. 509, 517 (2004). In answering the second question, the United States Supreme Court has held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 159 (2006).

To ascertain whether Title II of the ADA validly abrogates state sovereignty in any given Fourteenth Amendment case, the Supreme Court requires the following assessment be made on a "claim-by-claim basis" by determining: "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment;[6] and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* The Sixth Circuit holds that the above test is "required" when states raise sovereign immunity as a defense to a Title II ADA claim that also implicates Fourteenth Amendment rights. *Mingus v. Butler*, 591 F.3d 474, 483 (6th Cir. 2010) (citing *Zibbell v. Mich. Dep't of Human Servs.*, 313 F. App'x 843, 847 (6th Cir. 2009)).

> a.   *Plaintiffs' Allegations which Implicate a Violation of the Fourteenth Amendment's Equal Protection Clause*

Here, MDOC does not contest that Congress unequivocally expressed its intent to abrogate sovereign immunity as to ADA claims because the ADA specifically provides that: "[a] State shall not be immune under the Eleventh Amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this

---

[6] Here, plaintiffs argue that the challenged conduct implicates both their equal protection and due process rights under the Fourteenth Amendment.

chapter." 42 U.S.C. § 12202.  Rather, MDOC's position is that "*[b]ecause* the disabled are not a suspect class for equal protection purposes," plaintiffs cannot "establish[] that the alleged denial of services [in violation of Title II of the ADA] also constitutes [an actual] violation of the Fourteenth Amendment['s] [equal protection clause]," *i.e.* the second prong of the *Georgia* test. [15 at 18 (emphasis added)].  As discussed below, this position is flawed.

MDOC relies principally on *Popovich v. Cuyahoga Cnty. Court of Common Pleas*, 276 F.3d 808 (6th Cir. 2002) (en banc) for its argument that a Title II ADA claim resounding in equal protection does not abrogate sovereign immunity.  In *Popovich*, a hearing-impaired plaintiff sued an Ohio state court under Title II of the ADA "for allegedly failing to provide him with adequate hearing assistance in his child custody case." *Id.* at 811.  After a trial in the district court, the plaintiff obtained a jury award on the theory that the state court discriminated against him by failing to provide him with equal access to the courts and by unreasonably excluding him from the custody proceeding altogether. *Id.*  The Sixth Circuit held that the Eleventh Amendment barred the equal access claim "in so far as the action relie[d] on congressional enforcement of the Equal Protection Clause," but did not preclude the unreasonable exclusion claim "in so far as it relie[d] on congressional enforcement of the Due Process Clause." *Id.*  The Sixth Circuit reasoned that Congress did not have the constitutional authority under section 5 of the Fourteenth Amendment to abrogate sovereign immunity for the purpose of enforcing "equal protection-type" claims under Title II of the ADA. *Id.* at 818.  Importantly, however, the *Popovich* court based its conclusion on the following reasoning:

> …under equal protection principles, disability—unlike race—is not a "suspect category" and does not deserve "heightened scrutiny." Therefore, States may make reasonable employment decisions on the basis of disability.  Title I of the Disabilities Act, which addresses discrimination in employment based on disability, may only trigger

17

"minimum rational-basis review," and Congress may not enforce the Equal Protection Clause by creating a higher standard of liability and enforcing it against the states in federal court. Sovereign immunity under the Eleventh Amendment forbids heightened state liability in federal courts in disability claims because such claims have never before received more constitutional protection than rational basis review.

*Id.* at 812 (internal citations omitted).[7]

The problem with defendants' reliance on *Popovich* is that the Sixth Circuit subsequently clarified in *Mingus* that, as long as a plaintiff seeks only the level of review to which he would otherwise be entitled (*i.e.*, "rational basis" review in a disability case) – and not a heightened level of review (*i.e.*, "strict scrutiny") – Eleventh Amendment immunity as to his ADA claim would be abrogated because doing so would not "creat[e] a higher standard of liability" for the defendant. In *Mingus*, 591 F.3d 474, the plaintiff inmate suffered from macular degeneration. He filed a civil rights complaint against prison officials alleging violations of the Eighth and Fourteenth Amendments, and the ADA, though his claims all essentially arose out of allegations that Mingus' requests for a single-occupancy room with key-operated locks were denied while "other inmates, especially able-bodied ones, receiv[ed] single-occupancy rooms." *Mingus*, 591 F.3d at 477. The district court, relying on the 2006 U.S. Supreme Court ruling in *Georgia*, found

---

[7] Unlike the "equal protection-type" claims, the Sixth Circuit recognized that the same problem of congressional overreach is not implicated where Title II of the ADA is used to enforce "due process-type" claims. *Id.* at 817. The *Popovich* majority noted that "the 'participation' requirement of Title II serves to protect Popovich's due process right to a meaningful hearing. In child custody cases involving hearing-impaired parents, Congress is well within its express authority under Section 5 to require states to accommodate parental disability and to refrain from retaliation, for Congress is 'enforcing' the due process right rather than 'expanding' it." *Id.* at 815. Thus, defendants do not argue that they enjoy Eleventh Amendment immunity as to the portion of plaintiffs' Title II claim which implicates their due process rights. [15 at 18]. Rather, they essentially argue that defendants' due process claims fail as a matter of law because "there is no constitutionally protected due process right to an effective prison grievance procedure." [*Id.*]. The Court addresses that argument below.

that "Title II of the ADA abrogated state sovereign immunity in official capacity suits," and thus allowed Mingus' ADA claim to proceed.

On appeal, the Sixth Circuit affirmed.  Like the district court, the Sixth Circuit relied heavily on *Georgia*, in particular, the Court's conclusion that "insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."  *Id.* (quoting *Georgia*, 546 U.S. at 159).  Specifically, the Sixth Circuit held that MDOC's sovereign immunity had been abrogated as to the plaintiff's Title II ADA claim because he did "not claim to deserve heightened scrutiny as a member of a suspect class but instead challenge[d] the rational basis for [defendant's] actions."  The Court explained:

> the district court found that there exists a genuine issue of material fact with respect to the rational basis for Butler's actions … At this stage in the litigation, Mingus has alleged misconduct that actually violated the Fourteenth Amendment—namely, treatment unequal to that received by other disabled inmates.
>
> … Mingus has alleged that the same misconduct by [defendants] violated the Fourteenth Amendment and the ADA independently.  Regarding the former, he alleged that "there is no rational basis for the classification allowing able bodied prisoners, and those with medical problems less serious than Plaintiff's, as qualifying for a single-occupancy room."  As to the ADA, he claimed that he was being "discriminated against as a result of [his] disability, where other prisoners with different disabilities, or no disabilities at all, are provided with single-occupancy rooms."  In both instances, the gravamen of his complaint is that he was treated differently than similarly situated prisoners or prisoners with fewer, or less serious, disabilities with no rational basis underlying the disparate treatment.  Thus, Mingus has alleged misconduct that independently violated both Title II of the ADA and the Fourteenth Amendment.
>
> Butler's reliance upon *Popovich* is misplaced … In this case, [] Mingus does not claim to deserve heightened scrutiny as a member of a suspect class but instead challenges the rational basis for [defendant's] actions.

*Id.*, at 482-83.

19

Analogizing to the Title II ADA claim asserted in *Mingus*, plaintiffs in this action allege that "Defendants' failure to provide effective communication for individuals with hearing disabilities denied and continues to deny, on the basis of their disability, Plaintiffs the same access to Defendants' services, benefits, activities, programs, or privileges as the access provided to hearing individuals." [1 at ¶121].   Importantly, this does not equate to an assertion that plaintiffs are entitled to "strict scrutiny" review of this alleged unequal treatment.   In fact, plaintiffs emphasize that they "do not claim to be members of suspect class." [23 at 19].   In other words, plaintiffs make factual allegations which could both support an equal protection claim (albeit under "rational basis" scrutiny), and a claim under Title II of the ADA.   Defendants' assertion that "*[b]ecause* the disabled are not a suspect class for equal protection purposes," plaintiffs *cannot* "establish[] that the alleged denial of services [in violation of Title II of the ADA] also constitutes [an actual] violation of the Fourteenth Amendment['s] [equal protection clause]," is simply inaccurate.  [15 at 18 (emphasis added)].

The plaintiffs thus satisfy the second prong of the *Georgia* test, and Eleventh Amendment immunity is abrogated as to their Title II ADA claim.[8]

> b.   *Plaintiffs' Allegations which Implicate a Violation of the Fourteenth Amendment's Due Process Clause*

MDOC also argues that it is entitled to Eleventh Amendment immunity on plaintiffs' ADA claim to the extent that claim implicates the Fourteenth Amendment's due process clause. MDOC concedes that the State's sovereign immunity would be abrogated to the extent plaintiffs'

---

[8] Because the Court has found that plaintiffs alleged misconduct that violates the Fourteenth Amendment, it need not consider the third prong of the *Georgia* test, which is implicated only where the alleged "misconduct violated Title II but did not violate the Fourteenth Amendment."

Title II ADA claim was aimed at remedying a *cognizable* due process violation.  [15 at 18].

MDOC argues, however, that plaintiffs have not alleged such a violation.  Yet the entirety of

MDOC's argument on this issue is its assertion that "the Sixth Circuit has previously held that

there is no constitutionally protected due process right to *an effective prison grievance*

*procedure.  Walker v. Mich. Dep't Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005)…[and]

prisoners have no constitutional right to rehabilitation, education or jobs. *Canterino v. Wilson*,

869 F.2d 948, 952-54 (6th Cir. 1989)."  [15 at 19 (emphasis added)].  This argument lacks merit

because plaintiffs' allegations implicate due process concerns not with respect to prison

grievance procedures or obtaining education or a job while in prison, but rather with respect to

the inability to meaningfully defend themselves at disciplinary and parole proceedings, impeding

their freedom to communicate with relatives, and infringing upon their free exercise of religion

by failing to provide sign interpreters at religious services. [*Id.* at 21-22].  MDOC's failure to

address the plaintiffs' real claims alone merits denial of the relief it requests.

Even on the merits of plaintiffs' actual claims, MDOC's motion should be denied.  Due

process requires that prisoners in disciplinary proceedings be given: "1) written notice of the

charges at least twenty-four hours in advance; 2) an opportunity, when consistent with

institutional safety and correctional goals, to call witnesses and present documentary evidence in

his defense; and 3) a written statement by the factfinders as to the evidence relied on and the

reasons for the disciplinary action."  *Davis v. Zuercher*, No. 09-5398, 2009 U.S. App. LEXIS

29570, at *5-6 (6th Cir. Dec. 16, 2009) (citing *Wolff v. McDonnell*, 418 U.S. 539, 564-67

(1974)).  In addition, "some evidence must exist to support the disciplinary conviction." *Id.* at *6

(citing *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455-56 (1985)).  Underlying these

requirements is the principle that prisoners must be able to comprehend the nature and subject of

these proceedings.  In fact, as this Court has recently explained, "A prison inmate does retain 'a 'liberty' interest, guarded by due process, with respect to state-imposed prison discipline that rises to the level of an 'atypical and significant hardship on the inmate.''"  *McGhee v. Warren*, No. 14-12753, 2015 WL 5608346, at *3 (E.D. Mich. Sept. 9, 2015) (quoting *Hardin-Bey v. Rutter*, 524 F.3d 789, 791 (6th Cir. 2008)).  *See also e.g.*, *Holmes v. Godinez*, 11-2961, 2015 WL 5920750, at *50 (N.D. Ill. Oct. 8, 2015) ("the Seventh Circuit has held that in a criminal proceeding, due process is denied when a defendant is unable to comprehend the proceedings because of language barriers." (citing *United States v. Johnson*, 248 F.3d 655, 663 (7th Cir. 2001)).  Thus, it is clear that prison officials must provide at least some process before subjecting an inmate to an atypical and significant hardship.

Numerous district courts have extended this principle to inmates subject to disciplinary hearings who cannot understand the proceedings on account of a language barrier or hearing-impairment. *See* Holmes, 2015 WL 5920750, at *51 ("hearing impaired inmates who are not fluent in English may have a due process right to a qualified [sign language] interpreter at prison disciplinary hearings."); *Clarkson v. Coughlin*, 898 F.Supp. 1019, 1049-50 (S.D.N.Y. 1995) (finding prison's failure to provide hearing accommodations to deaf inmates disciplinary, grievance and parole hearings constituted denial of due process); *Bonner v. Arizona Dept. of Corr.*, 714 F.Supp. 420, 425 (D.Ariz. 1989) (determining that deaf inmate had a due process liberty interest in a qualified sign language interpreter during disciplinary hearing proceedings); *Sandoval v. Holinka*, No. 09-033, 2009 U.S. Dist. LEXIS 15565, at *7-8 (W.D. Wis. Feb. 27, 2009) (noting that the due process rights of a Spanish-speaking inmate may have been violated "if [he] did not comprehend the proceedings or process he was subject to.").  Thus, at least at this stage of the litigation, MDOC has not shown that plaintiffs' ADA claim allegations regarding

22

their ability to meaningfully participate in disciplinary hearings could not also support a due process violation.

Nor have defendants shown that plaintiffs' assertion, that the alleged ADA violations impede their freedom to communicate with relatives and infringe upon their free exercise of religion by failing to provide sign interpreters at religious services, fail to implicate due process concerns.  *See Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) (noting "the well-established rule that 'almost all § 1983 claims rely on the substantive component of the Due Process Clause because it is through that vehicle that fundamental rights are incorporated against the states.'").  Thus, plaintiffs have satisfied *Georgia's* second prong as to this aspect of their ADA claim, and the Court need not reach the third prong.  *Supra*, fn. 9.

In sum, whether under the Equal Protection Clause or the Due Process Clause, the Court concludes that the plaintiffs' Title II ADA claim abrogates MDOC's sovereign immunity under the standards articulated in *Georgia*.

3.    *RLUIPA*

Defendants argue that plaintiffs' RLUIPA claim should be dismissed because the failure to provide plaintiffs with sign language interpreters at religious services does not impose a "substantial burden" on their religious exercise.  RLUIPA provides that, "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government demonstrates that such an imposition: (1) "is in furtherance of a compelling governmental interest;" and (2) is the "least restrictive means" of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1(a)(1)-(2).  Citing *Thomas v. Review Bd. Of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981) and *Sherbert v. Verner*, 374 U.S. 398, 404

23

(1963) defendants assert that the "substantial burden" test requires proof that MDOC officials pressured plaintiffs to either violate their religious beliefs or abandon a precept of their religion.

On the other hand, plaintiffs urge the Court to adopt the version of the "substantial burden" test enunciated in *Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014). In that case, the Sixth Circuit Court of Appeals held that a "substantial burden" is imposed when prison officials either: (1) "place[ ] substantial pressure on an adherent to modify his behavior and to violate his beliefs;" or (2) "effectively bar his sincere faith-based conduct." *Id.* at 565. Applying this standard, the Sixth Circuit reversed the district court's award of summary judgment to the defendants and found that a genuine issue of material fact existed as to whether Kentucky prison officials placed a "substantial burden" on inmates' religious exercise by denying them access to some of the traditional foods used at a religious ceremony. *Id.* at 561-65. Since *Haight* is the Sixth Circuit's most recent and salient elucidation of the "substantial burden" test, the Court adheres to its holding.

Applying the appropriate legal standard, the Court finds that summary judgment should be denied. The factual record in this case is entirely undeveloped. Defendants do not proffer any evidence that would assist the Court in evaluating whether they placed a substantial burden on McBride's religious exercise by failing to provide her with a sign language interpreter at religious services. Nor do defendants identify "a compelling governmental interest" that would justify their failure to provide an interpreter or sufficiently demonstrate that such an interest was served "in the least restrictive way." *Id.* at 566. Consequently, defendants have failed to show the absence of a genuine dispute of material fact, and are not entitled to summary judgment on the RLUIPA claim. *Celotex*, 477 U.S. at 325; *Alexander*, 576 F.3d at 558.

24

4.      *Free Exercise Clause*

Defendants similarly contend that the failure to provide sign interpreters for religious services does not violate the Free Exercise Clause because plaintiffs are not coerced in any way or penalized for the content of their religious beliefs. Defendants urge the Court to look to the U.S. Supreme Court in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), for the proper legal standard to apply to plaintiffs' free exercise claim. There, the Court ruled that the construction of a road through a national forest for the purpose of timber harvesting did not violate the free exercise rights of local Native American tribes who used the same land for religious purposes. The Court found that the government had not "coerced" the tribes "into violating their religious beliefs" nor "penalize[d] religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Id.* at 449.

Plaintiffs argue that "Defendants' unlawful and unjustified discrimination against Plaintiffs violates Plaintiffs' religious exercise" under the First Amendment." [23 at 24]. While this may be true, plaintiffs' cursory statement does not provide the Court with a substantive analysis of the relevant issue. Plaintiffs appear to be urging the Court to adopt the standard articulated in *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993), where the Supreme Court held that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Citing to *Employment Div. Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990), the Supreme Court noted that a provision that fails "to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531-32.

25

The Court finds that neither *Lyng* nor *Church of Lukumi* provides the proper legal standard for the plaintiffs' free exercise claim.  In *Flagner v. Wilkinson*, 241 F.3d 475, 481 (2001), the Sixth Circuit clearly stated that "the proper standard to apply in prisoner cases challenging restrictions on the free exercise of religion is supplied by the Supreme Court's decision in *Turner* [*v. Safley*, 482 U.S. 78, 89 (1987)]."  *Id.*  There, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.  The *Turner* Court then went on to enumerate four factors that should be considered when analyzing the reasonableness of a challenged prison regulation.  The Sixth Circuit has summarized these factors as follows:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.  If not, the regulation is unconstitutional, and the other factors do not matter.  Unlike the first factor, the remaining factors are considerations that must be balanced together: (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.

*Berryman v. Granholm*, 343 F. App'x 1, 6 (6th Cir. 2009) (quoting *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999)).

But even under the framework set forth in *Turner*, plaintiffs highlight the same glaring omission that scuttled defendants' challenge to the RLUIPA claim–the absence (at least at this early stage of the litigation) of any supporting evidence in the record.  The Court agrees with plaintiffs that defendants "have not even attempted to identify specific, undisputed facts, bearing on whether [or not] Defendants have violated Plaintiffs' religious exercise rights." [23 at 24-25].

26

And defendants' motion lacks any meaningful analysis of the factors specified in *Turner*. Without more, defendants' motion for summary judgment should be denied with respect to plaintiffs' free exercise claim.

## III. CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that defendants' motion for partial summary judgment **[15]** be **DENIED**.

Dated: October 30, 2015         s/David R. Grand
Ann Arbor, Michigan         DAVID R. GRAND
                       United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 30, 2015.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

28