# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| MARY ANN MCBRIDE, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Civil Action No. 2:15-cv-11222 |
| v. | ) | |
| | ) | Hon. Sean F. Cox |
| MICHIGAN DEPARTMENT | ) | Mag. David R. Grand |
| OF CORRECTIONS, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

---

## EXHIBIT Q

Expert Report of Dennis Cokely, Ph.D. (October 28, 2016)

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

MARY ANN MCBRIDE, et al.,         )
                                           )

             Plaintiffs,         )
                                           )

                v.               )     Case No. 2:15-cv-11222
                                           )

MICHIGAN DEPARTMENT OF       )     Hon. Sean F. Cox
CORRECTIONS, et al.,           )     Mag. David R. Grand
                                           )

             Defendants.

---

# EXPERT REPORT OF DENNIS COKELY, Ph.D

# TABLE OF CONTENTS

I.     EXPERT QUALIFICATIONS ............................................................... 1

II.    EXECUTIVE SUMMARY ................................................................... 2

III.   ANALYSIS ....................................................................................... 6

     A.    Defining *Deafness* ............................................................... 6

     B.    The American Deaf Community: A Linguistic And Cultural Minority ................ 8

     C.    Deaf People As A Linguistic Community .......................... 9

         1.    *American Sign Language* ........................................ 10

         2.    *Limitations Of English Within The American Deaf Community* .............. 13

         3.    *Limitations Of Lip-Reading And Speech Within The American Deaf Community* ......................................... 16

     D.    Sign Language Interpretation: Misconceptions And Certifications ..................... 23

     E.    d/Deaf And Hard Of Hearing Inmates At MDOC ............................. 29

     F.    Necessary Changes For MDOC Regarding Treatment Of d/Deaf And Hard Of Hearing Inmates ....................................... 30

         1.    *MDOC's Prevailing View Of D/Deaf And Hard Of Hearing Inmates.* ....................................... 30

         2.    *MDOC's Identification Of d/Deaf And Hard Of Hearing Inmates.* .......... 32

         3.    *MDOC's Assessment Of Effective Communication With d/Deaf And Hard Of Hearing Inmates.* ............................... 33

         4.    *MDOC's Inability To Ensure Communicative Access For d/Deaf And Hard Of Hearing Inmates.* .................... 36

         5.    *MDOC's Reliance Upon Written Communication With d/Deaf And Hard Of Hearing Inmates.* ........................ 37

         6.    *MDOC's Failure To Provide Necessary Visual Alarms And/Or Signals And Information.* ............................ 38

         7.    *MDOC's Failure To Provide Interpreters And To Ensure Effective Communication.* ............................ 40

8.    *MDOC's Failure To Provide Valid And Reliable Communication Assessments.* ............................................................................ 43

9.    *MDOC's Lack Of VRI Is Problematic And Inadequate.* ........................... 44

10.   *MDOC's Provision Of Telephonic Access Is Problematic And Ineffective.* ................................................................................... 45

11.   *Inadequate Or Non-Existent MDOC Policies And Procedures.* ............... 48

12.   *Providing Adequate Communicative Access.* ........................................... 49

IV.   CONCLUSIONS WITH RESPECT TO TREATMENT OF D/DEAF OR HARD OF HEARING INMATES IN MDOC FACILITIES. ...................................... 52

V.    SUMMARY ............................................................................................... 54

VI.   REFERENCES ............................................................................................ 57

**EXPERT REPORT OF DENNIS COKELY, Ph.D.**

## I.      EXPERT QUALIFICATIONS

I am currently a tenured Professor of American Sign Language ("ASL") and Modern Languages at Northeastern University. I am the Director of the American Sign Language Program, former Director of the World Languages Center and the former Chair of the Department of Languages, Literatures and Cultures. I have been involved with Deaf people on a personal and professional level for 48 years. I hold a Masters in Applied Linguistics from American University and a Doctorate in Sociolinguistics from Georgetown University. I am a nationally certified Sign Language interpreter and have served two terms as President of the Registry of Interpreters for the Deaf ("RID"), the professional organization of and the national certifying body for interpreters. I have authored or coauthored 10 textbooks, five book chapters, and 35 articles or conference proceedings, and have directed and/or edited over 350 videotapes focusing on American Sign Language and ASL/English Interpretation. I also have produced published translations of over 80 videotapes. The 1980 series of five texts that I co-authored is still widely used in Sign Language programs and classes across the United States. My 1992 book, *A Sociolinguistic Model of the Interpretation Process*, is widely used in Interpreter Education Programs and has been translated into Italian and German and significant portions have been translated into Swedish and Japanese. I am currently the Principal Investigator for a $3 million grant from the U.S. Department of Education to establish a National Interpreter Education Center at Northeastern University.

Prior to coming to Northeastern, I spent 12 years working full-time as the President and co-owner of Sign Media, Inc., a video-production company specializing in producing print and video material focused on the American Deaf Community ("Deaf Community" or "Community"), American Sign Language, and ASL/English Interpretation. Prior to that I spent 13 years working at Gallaudet

University[1] in a number of capacities: a teacher of elementary, undergraduate and graduate students; an administrator responsible for teaching and evaluating faculty and staff; and a Research Associate in the Linguistics Research Lab researching ASL/English interpretation. Attached as **Exhibit A** is my complete curriculum vitae, which also includes (at pp. 8 & 9) a listing of the other instances in which I have served as an expert witness.

I have been retained by Covington & Burling, LLP to work on this case at the rate of $200.00 per hour.  In addition to being based on my knowledge and experience, my report is based on: (1) face-to-face meetings with several inmates at the following Michigan Department of Corrections ("MDOC") facilities: Women's Huron Valley Correctional Facility ("WHV"), Carson City Correctional Facility ("DRF") and Saginaw Regional Correctional Facility ("SRF"); (2) a visual inspection of WHV, DRF and SRF facilities; and (3) a review of materials provided to me by counsel and identified in **Exhibit B**.

## II.   <u>EXECUTIVE SUMMARY</u>

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Community is American Sign Language. The vast majority of people who are not deaf have stereotypic misconceptions about d/Deaf [2] people and American Sign Language. They often believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when in reality the level of lip-reading accuracy for most Deaf people is 30% at best. Those who are not deaf often believe that d/Deaf people can read and write in fluent English when, in reality, the average Deaf person reads at approximately a fourth-grade reading level. Those who are not d/Deaf often fail to understand that effective

---

[1] Gallaudet University is a federally chartered private university for the education of d/Deaf and hard of hearing people located in Washington, D.C.

[2] The significance of the distinction between lower case and upper case D in the word d/Deaf is explained below.

communication with d/Deaf people requires that one communicate visually, such as by using visual signals and alarms and provision of sign language interpreters when needed. These erroneous, stereotypic beliefs about and attitudes toward d/Deaf people frequently result in systematic discrimination against d/Deaf people. Such discrimination, known as audism, occurs when those who are not d/Deaf assume that d/Deaf people are inferior because of their different hearing status and when access to environments, technology, institutions and programs is predicated upon one's ability to hear. Simply put, the failure to provide visual access to aspects of society that are only auditorily accessible is audism.

Based on my experience of over 48 years, my visits to WHV, DRF and SRF on May 3 and 4, 2016 and meetings with inmates at those facilities, and my review of written documentation, I believe that d/Deaf and hard of hearing inmates in the MDOC have been denied effective communication and access to the services and technology that make effective communication possible. I believe that MDOC has restricted access to services, programs and communication in a way that denies meaningful and effective communicative access for MDOC d/Deaf and hard of hearing inmates. I further believe that the procedures put in place unfairly and unnecessarily treat d/Deaf and hard of hearing MDOC inmates differently than non-deaf inmates and deny them access to services, programs and benefits that are afforded to non-deaf inmates. I also believe that the issues I observed at the three MDOC facilities, the policies and procedures I have reviewed in documents provided to me, and the treatment of d/Deaf and hard of hearing inmates revealed during my interviews makes it clear to me that these issues are system-wide and not just restricted to those three facilities. In sum, I believe that MDOC engages in audist behaviors.

To ensure effective communication, as well as the physical safety of d/Deaf and hard of hearing inmates, MDOC must, minimally, undertake the following major steps.

3

A.    In order to enable d/Deaf and hard of hearing inmates to communicate effectively with others at MDOC facilities, MDOC must reliably provide d/Deaf and hard of hearing inmates with qualified sign language interpreters.  This need is most acute in all group settings and all "high stakes" one-on-one interactions, such as medical appointments and visits, psychological evaluations, offender treatment programs, disciplinary/investigative proceedings, religious activities and educational courses and evaluations. For those situations in which a qualified sign language interpreter is needed on short notice or in an emergency situation, MDOC should provide d/Deaf and hard of hearing inmates access to Video Remote Interpreting ("VRI") that functions reliably and appropriately.

B.    In order to enable d/Deaf and hard of hearing inmates to communicate effectively with others outside of MDOC facilities, MDOC must provide d/Deaf and hard of hearing inmates with access to a videophone and, if functionally appropriate, a CapTel phone. Currently, the MDOC has TTY (TeleType Writer) devices at some of their facilities.  A TTY is a device that allows d/Deaf and hard of hearing individuals to communicate via phone lines using typed words. TTYs have been used by d/Deaf and hard of hearing people since the early 1970s. These devices enable d/Deaf and hard of hearing people to communicate over existing telephone lines by using the keyboard in the TTY to send acoustic signals that are then converted into text by the recipient's TTY. The TTY devices at MDOC facilities are antiquated, functionally limited, and insufficient for many d/Deaf and hard of hearing inmates because, like the vast majority of Deaf people, they cannot communicate effectively in written English. Communicating using a TTY requires that each party has a TTY and that each party is comfortable communicating in written English.  Another more important reality is that the majority of d/Deaf people no longer

possess TTYs as they now rely on videophones (VP) for communication. A videophone would enable d/Deaf and hard of hearing inmates to communicate with other deaf individuals using sign language and permit real-time interpretation through the free Video Relay Service ("VRS"), enabling them to communicate with individuals who do not know sign language. A CapTel phone would permit d/Deaf and hard of hearing inmates with intelligible speech and proficiency in reading English to speak into the phone and then read the other individual's words, which are transcribed in real time and for free by a relay operator. Videophones and CapTel phones can be provided at either zero cost or minimal cost to d/Deaf and hard of hearing individuals.

C.   In order to ensure that MDOC d/Deaf and hard of hearing inmates are notified of alarms or institutional emergencies at MDOC facilities, MDOC must at least install flashing light boards inside each d/Deaf and hard of hearing inmate's cell or install strobe lights that are clearly visible from inside each d/Deaf and hard of hearing inmate's cell. Based on my visual inspection of MDOC facilities and my interviews with inmates, it is apparent that there are no flashing light boards within the common areas (e.g. hallways, medical facilities, day rooms). There is a page alert system in place at WHV. However, several inmates report that pages often are bundled and sent at the end of the day and thus do not provide real-time notification. No such page alert system was in place at any of the other facilities I visited.

D.   Additional non-aural notifications could include bed-shaking devices that would vibrate to alert d/Deaf and hard of hearing inmates in the event they are asleep when an alarm is activated.

5

E. MDOC must review all of its policies and procedures to ensure that d/Deaf and hard of hearing inmates are not systematically disadvantaged relative to inmates who are not d/Deaf or hard of hearing.

F. MDOC should require mandatory regular training/orientation sessions for all MDOC personnel who are responsible for or have the need to interact with d/Deaf and hard of hearing inmates. These training sessions should address stereotypes and biases that MDOC personnel may hold against d/Deaf and hard of hearing inmates.

Finally, as additional information becomes available, I expect to examine that material and expand upon the opinions offered in this report.

## III.   <u>ANALYSIS</u>

A.   <u>Defining *Deafness*</u>

Although it is often the case that those seeking to define or discuss deafness do so from a medical or audiological perspective, such a singular perspective significantly misses the mark. The meaning of deafness is best understood "when it is viewed as a social phenomenon rather than as a physical disability. To say this is not to deny the usefulness of studying deafness medically but rather to point out that such an approach tends to overlook how their deafness influences deaf peoples' daily lives, how the disability of deafness becomes a handicap." (Schein, 1996).[3]  Schein goes on to define deafness as "the common outcome of diverse causes resulting in an inability to hear and understand speech through the ear alone." The critical import of this definition is that it emphasizes communication – a quintessential function of human beings. This definition specifies that people who are deaf cannot

---

[3] All secondary sources referenced in my report are listed in their entirety in the "References" section of my report, listed at pg. 57.

hear *and* cannot understand speech; they may be able to hear speech but cannot understand it (i.e. cannot discriminate what is said). Even if they can hear loud noises and are aware that someone is talking, they are still deaf by this definition if they cannot understand the speech they hear. This functional definition then clearly and helpfully distinguishes the difference between those who are hard of hearing (those who have reduced hearing ability but can hear and understand speech) and those who are deaf (those who cannot hear *and* cannot understand speech).

The age at which one becomes deaf is critically important because this determines membership in one of two subsets within the larger class of deaf individuals. Childhood deafness creates significant obstacles to acquiring spoken language and becoming literate in English, and is generally associated with a tendency to seek out and socialize with other deaf people, thus becoming part of the American Deaf Community. Adult onset deafness, on the other hand, generally does not interfere with speech and those who become deaf as adults generally do not seek out members of the American Deaf Community (i.e. those early deafened) for companionship, nor do members of the American Deaf Community seek out late-deafened adults for companionship. This is because, although members of each subset are deaf (i.e. they cannot hear *and* cannot understand speech), and although members of each subset rely upon visual not auditory means of communication, their life experiences have had different trajectories.

### Summary Of Opinions With Respect To Defining Deafness:

- The meaning of deafness is best understood when viewed as a social and communicative phenomenon rather than simply as a physical disability.

- The class of people who are deaf cannot hear and cannot understand speech.

- Within the class of people who are deaf, there are two subsets: those who are deaf from childhood and those who become late-deafened.

- Although each subset is deaf and relies upon visual communication, their life experiences have been very different.

7

B.      The American Deaf Community: A Linguistic And Cultural Minority

There is an identifiable subset of deaf people in America that is unable to rely upon hearing and speech as an effective and primary means of relating to the world and interacting with those who are not deaf. As children, some of these individuals, by virtue of parental decision or educational placement, are placed on a trajectory where they will spend their lives pursuing the goal of assimilating with the hearing and speaking majority of the population (i.e. trying to "pass") to the extent possible. Others, however, are placed on a very different trajectory because they have been given or choose to embrace a different "center" for their lives – a Deaf center. These deaf individuals see themselves as Deaf. The written distinction between "deaf" and "Deaf," lower and upper case, has been used since 1972 to differentiate between those who are deaf and those who are deaf but who also identify as a member of a linguistic and cultural minority (Woodward, 1972).

Individuals who are Deaf use American Sign Language and are fundamentally a visual people, with their own visual language, social organizations, history, and mores. They see themselves as members of the Deaf-World. Indeed, a case has been made that members of the Deaf-World should be viewed as an ethnic group rather than a "disabled" group (Lane, Pillard & Hedberg, 2011). Contrary to the view held by most non-deaf people, Deaf people do not view their audiological condition as the primary reality that binds them together as a Community. Although society in general may view their audiological condition as a defining element for Deaf people, what binds Deaf people together is their use of American Sign Language. Deaf people are a linguistic and cultural minority that has been, and continues to be, communicatively disadvantaged by the hearing and speaking majority (e.g., Padden and Humphries, 2005; Lane, 1992; Jankowski, 1997; Wrigley, 1996). In short, these individuals, united by their use of American Sign Language, are members of the American Deaf Community.

8

The use of American Sign Language not only unites Deaf people but it also defines them as a linguistic minority. The primary reason for the central role of American Sign Language is that, unlike any other means of communication available to Deaf people, American Sign Language is the only means of communication that enables effective, efficient and reliable communication.

While some late-deafened adults do try to learn to sign, they often do so to compensate for the deteriorating intelligibility of their speech, to communicate with family members or friends who are learning to sign or perhaps to communicate with Deaf people they have met. However, learning to sign does not automatically mean that they wish to identify themselves as Deaf; late-deafened adults usually continue to identify themselves as deaf – unable to hear, sharing an audiological condition and the need for visual means of communication with Deaf people – but they do not see themselves as having a linguistic and cultural identity as a member of the Deaf Community.

### <u>Summary Of Opinions With Respect To The American Deaf Community:</u>

- Deaf people are unable to rely upon their hearing and speech as an effective and primary means of relating to the world and interacting with the majority.

- Members of the American Deaf Community have their own visual language: American Sign Language.

- Deaf people are a linguistic and cultural minority that is communicatively disadvantaged by the hearing and speaking majority.

- American Sign Language is central to determining membership in and defining the American Deaf Community.

- American Sign Language is the only means of communication that enables effective, efficient and reliable communication for members of the American Deaf Community.

C.      <u>Deaf People As A Linguistic Community</u>

Although the existence of an American Deaf Community is now undeniable, most people with little or no knowledge of or experience with d/Deaf people make a number of stereotypic and unfounded

assumptions about d/Deaf people (Cokely, 2001; Spingarn, 2001). For example, they wrongly assume that "all deaf people can lip-read" or that "all deaf people can speak" or that "all deaf people are fully literate in English." While these are uninformed and naïve views of d/Deaf people, the long-standing and well-documented reality is that members of the American Deaf Community, as a group, do not use their speech for communication, do not lip-read English well and, as a group, have extremely limited competence in English.

However, as noted above, the most significant factor uniting and identifying members of the American Deaf Community is not whether a Deaf person uses speech, the degree of hearing possessed by a Deaf person, or competence in English. Rather, it is whether a person uses American Sign Language (ASL) as his/her primary means of communication. The use of American Sign Language provides a means of determining acceptance into the Community, enables social interaction among members of the Community, and, through the use of ASL/English interpreters, provides a ready means of interacting with non-deaf people. The importance of American Sign Language derives from the fact that it is a visually clear and accessible means of communication that enables Deaf people to have effective and efficient communication with each other and, by employing the services of an ASL/English interpreter, with the hearing and speaking majority.

Because of the essential nature of American Sign Language in defining the American Deaf Community as a linguistic minority, it is important to address and dispel several misconceptions about ASL.

       *1.*     *American Sign Language*

A primary misconception often held by those unfamiliar with American Sign Language is that they assume it is simply a manual form of, or a derivative form of, spoken English. They assume wrongly. The lexicon (i.e. the vocabulary) of a signed language refers, not to the words of a spoken

language, but rather directly to the concept or meaning that Deaf people wish to convey (Baker-Shenk & Cokely, 1980; Valli, Lucas & Mulrooney, 2005). In American Sign Language, signs refer not to English words, but rather to the concepts or meanings that its users wish to convey and exchange. For example, the American Sign Language sign refers to an object (e.g., a cat) and not to the English word for that object (just as the Japanese word "neko" refers, not to the English word "cat" but to the cat itself). American Sign Language has a lexicon and syntactic structure quite unlike that of spoken English. In simplest terms, there is not a one-to-one correspondence between American English words and the signs in American Sign Language, as is true of any two languages, spoken or signed. Instead, American Sign Language is a naturally evolved language used by members of the American Deaf Community and those non-Deaf people who have learned or acquired it. The linguistic evidence is clear and incontrovertible – American Sign Language is structurally different from English. (Stokoe, et al. 1965).

Another way in which ASL differs from English is that it does not have a conventionally accepted written form, i.e. an orthography. This is true of all of the signed languages and many of the spoken languages in the world. There have been several attempts at creating a notation system for recording signed languages, the most notable of which is Stokoe notation system (Stokoe, et al 1965). However, like the International Phonetic Alphabet that is used to transcribe spoken languages, the use of Stokoe notation system has largely been restricted to linguists and is now being replaced by digital video recordings and computer programs that are being used to record and analyze signed languages (e.g. Boston University's SignStream http://www.bu.edu/asllrp/SignStream/). A more widely used means of trying to record signs is "glossing" (e.g. Baker-Shenk & Cokely, 1980), in which an English word written in all capital letters is used to refer to a sign. Thus the gloss "CAT" refers to the sign that is used to represent the concept "cat". Glossing has some severe limitations however. Unlike Stokoe notation, the reader of a glossed transcription must already know the sign being referred to in order to

approximate the articulation of the sign that was glossed. Also the same gloss may refer to two different variants of the same sign, since glossing does not capture articulatory behaviors. Despite these limitations, it is not uncommon for Deaf people to use glosses when writing notes or when communicating with a TTY. TTYs began as retrofitted, discarded Western Union teletype machines, hence the acronym TTY.  Newer devices are also referred to by the acronym TDD - Telecommunication Device for the Deaf.  TTYs/TDDs make it possible for Deaf people to type to each other over existing phone lines; but TTYs/TDDs are now virtually obsolete because of the ubiquitous presence of Videophones within the Deaf Community.

However, glossing is not a written form of American Sign Language, nor is it written English, even though the words may be English words. It is practically and linguistically inconceivable that a written two-dimensional form could reliably and easily capture three-dimensional moving, signed, conversational interactions. Analog and digital video recordings and the use of Videophones (essentially internet signed communication using video web-cams) not only have rapidly replaced TTYs and the need for a written form of American Sign Language, but also have provided a more accurate means of preserving and sharing signed interactions.

Deaf people as a group are unable to rely upon their hearing and speech as an effective and primary means of communication. Likewise, they also are unable to rely upon means of communication that are based on or derived from speech and hearing, such as written English, as an effective and primary means of communication. For Deaf people, the use of American Sign Language is not simply a matter of convenience or preference. American Sign Language provides the only effective and efficient means of linguistic communication for members of the Deaf Community.

### 2.      *Limitations Of English Within The American Deaf Community*

It is clear and undeniable that members of the American Deaf Community embrace and accept American Sign Language, and that its use is central to defining and understanding the Deaf Community. It is also clear that Deaf people exist as a linguistic minority within a society in which English is the dominant language. However, there are significant challenges that Deaf people, as a group, face in becoming fluent in English. Some of these challenges are the same as those for any second language learner, but other, more severe challenges exist for Deaf people. Nevertheless, one of the widely held misconceptions about Deaf people is that although they do sign, they can read and write English fluently. As with other misconceptions about Deaf people, this has no basis in fact or reality.

While it certainly is a desirable goal for Deaf individuals to be competent in both ASL and English, the reality is that for the vast majority of Deaf people, competence in English is rarely attained. Certainly the history of the education of Deaf students attests to the fact that, for the vast majority of Deaf people, acquiring competence in <u>spoken</u> English is virtually unattainable (among others, Marschark & Spencer, 2003; Wrigley, 1996; Lane, 1992). Also, the majority of Deaf people do not attain competence in <u>reading</u> and <u>writing</u> English because those forms of communication are derived from spoken English. According to Karchmer and Mitchell (2003), study after study concludes with the same overriding concern: "…the average performance on tests of reading comprehension for deaf and hard of hearing students is several grade equivalents lower than their high school age hearing peers." (e.g. Allen, 1986; Traxler, 2000). The essential difficulty is that Deaf students are "…caught in a vicious circle: their impoverished vocabularies limit their reading comprehension and poor reading strategies and skills limit their ability to acquire adequate vocabulary knowledge from context." (deVilliers and Pomerantz, 1992). Thus, the commonly held misconception that Deaf people as a group can read and

write English fluently is easily dismissed. The evidence is overwhelmingly clear – Deaf people, as a group, are not competent users of English.

Certainly, most Deaf people achieve what might be termed "survival" English. This means that, as a group, Deaf people have a level of literacy that enables them to interact with much of the routine written English language that they encounter in their daily lives. It is the repetitiveness, predictability and/or limited context within which this written English occurs that facilitates Deaf people's comprehension. For example, they read street signs, menus, subway directions, advertising posters and flyers and other basic printed material that is necessary or useful for them to live their lives on a daily basis. As a group, Deaf people might be described as marginal readers. That is, Deaf people do subscribe to newspapers and magazines, although many seek out those portions of the publications supported by visual material (e.g., the comics page or advertising) or contain familiar arrays of numbers (e.g., the sports page). However, one should not mistake this level of responding to basic English print in routine day-to-day tasks with a level of literacy sufficient to rely upon printed material to gain non-recurring or important information or to read most books or magazines.

Deaf people also communicate via e-mail and TTY conversations, although those communications often read like written (i.e. glossed) versions of what they would sign. Further, Deaf people write notes to people who are not deaf, although their notes are frequently misunderstood. Just as in the non-deaf population as a whole, there is within the American Deaf Community a range of literacy. However, the critical point is that the average literacy level of members of the American Deaf Community is significantly lower than it is for the population as a whole.

According to the Gallaudet Research Institute, "For the 17-year-olds and the 18-year-olds in the deaf and hard of hearing student norming sample, the median Reading Comprehension subtest score

corresponds to about a 4.0 grade level for hearing students. That means that half of the deaf and hard of hearing students at that age scored above the typical hearing student at the beginning of fourth grade, and half scored below." (archived at http://web.archive.org/web/20011223062957/http://gri.gallaudet.edu/Literacy). Given this and given that literacy levels among the U.S. prison population are generally lower than those among the general population (Alaska Justice Forum 24(2): 2-4), one could reasonably conclude that the literacy levels among Deaf inmates would be lower than the non-deaf inmate population. In fact, given that the generally accepted definition of functional illiteracy is a level of reading and writing skills that is insufficient to manage tasks of daily living and employment that require a level of reading and writing beyond a basic level, one would expect that a greater proportion of Deaf inmates would be considered functionally illiterate than would be the case for the inmate population as a whole.

The difficulties that a limited level of literacy presents for Deaf people are clearly non-trivial. Consider, for example, that when one personality test was given to Deaf people using elementary English and again using ASL, the results were so different that the investigators concluded it was like giving two different tests. (Lane, 1992). This author goes on to describe the difficulties in administering psychological tests to Deaf people:

> Since Deaf test takers in America frequently are not fluent in English, they not only fail to understand test instructions thoroughly, invalidating the results, but also fail to understand the test content itself, as most tests are presented in written English, and in rather high-level English at that.
>
> One authority estimates that a tenth grade knowledge of English is needed to take most personality tests meaningfully. Yet only one deaf student in ten reads at eighth-grade level or better, and the average deaf student on leaving school has only a third grade command of English.
>
> Lane, 1992

Deaf people do attain a level of English that enables them to accomplish basic, routine and reoccurring tasks that involve written English. This variety of English has been called "Deaf English" (Charrow, 1974; 1975), which parallels, but is clearly not as proficient as, the English of those non-deaf people learning English as a second language.

It should be very clear that relying on standard written English as the primary or only means of communication with or for most Deaf people simply cannot be an effective means of communication. It is the unquestionable ineffectiveness of speech, lip-reading and written English when communicating with Deaf people that makes the use of qualified sign language interpreters necessary for effective communication. The use of qualified sign language interpreters is also an important means of effective communication for those late-deafened deaf adults who have learned to sign.

3.     *Limitations Of Lip-Reading And Speech Within The American Deaf Community*

As challenging and ineffective as it is for Deaf people, as a group, to communicate in written English, it is even more challenging, ineffective and impractical for them to communicate successfully via lip-reading (also called speech-reading). Given the challenges Deaf people have in acquiring competence in written English, this should not be surprising. Unlike the permanent presence of the printed word that makes possible repeated readings, the spoken word is ephemeral. Given that Deaf people struggle for accurate and complete comprehension with the stationary written word, one cannot expect any greater level of competence or effectiveness when Deaf people try to comprehend the fleeting spoken word as it appears on the speaker's lips.

The common misconception that most non-deaf people have is that all Deaf people can lip-read. They mistakenly believe that, lacking one of their senses, the ability to hear, Deaf people's visual sense – and hence their ability to lip-read – becomes more acute in order to compensate. Most non-deaf people do not understand or appreciate the difficulties and limitations involved in trying to lip-read. It is

extremely challenging to lip-read English because only a small fraction of the sounds used in the language are clearly visible. In fact, even someone who is fully fluent in and who has full auditory access to spoken English would struggle to lip-read English (non-deaf people have only to turn their television set to a Chinese or Russian language program and turn off the volume to experience this frustration firsthand). Consider the difficulty in trying to lip-read accurately the spoken English phrase "white shoes." To a person trying to lip-read this phrase, it could be understood as "white shoes" or "why choose." When we consider the fact that many of the sounds in English look the same to a lip-reader, it should not be surprising that Deaf people's comprehension of spoken language is usually quite poor and is always even worse than their competence in written English.

One has only to look at oneself in a mirror and soundlessly mouth each of the following pairs of words to have a sense of the impossibility of lip-reading accurately. In each of these pairs one of the words is listed on the Frye list [4] of the one hundred most commonly occurring words in English.

> *to/you, in/thin, it/hit, he/she, on/don, are/car, with/width, his/is, i/eye, be/bee, or/ore, one/won, by/bye, but/butt, not/knot, your/door, an/ant, which/witch, do/due, their/there, out/shout, then/ten, these/he's, so/sew, would/wood, like/lick, time/thyme, two/too, more/moor, see/she, no/know, way/weigh, been/bin, oil/coil, day/say*

According to Bernstein and Auer (2003) "Estimates of the upper extremes for the accuracy of lip-reading words in sentences have been as low as 10-30% words correct." This is in keeping with earlier work (Liben, 1978) that also provides evidence that speech-readers understand only about one fourth of what is said in dyadic (one-to-one) conversations.

Of course, there are a number of other uncontrollable factors beside the phonetic structure of English that make it extremely difficult for d/Deaf people to lip-read with any consistent degree of

---

[4] The Frye list consists of the one hundred most common words used in English ranked in order of frequency.

accuracy, such as a person's facial bone structure, facial musculature, facial hair, lighting, rate of speech, etc. (Bernstein and Auer, Jr. 2003). Given the inherent linguistic difficulties in lip-reading and the additional complications that arise from external factors, it is no wonder that lip-readers' comprehension is so limited.

If speech-readers understand only approximately a quarter of what is said in dyadic (one-to-one) conversations, it should not be surprising that the level of comprehension in small and large group interactions is significantly less. One reason for this is simply physical distance – the further away one is from a speaker the more difficult it is to discern fine muscle movements of the mouth necessary to lip-read. Another reason is because small group interactions in which a majority of the participants is not deaf generally rely upon turn-taking regulatory mechanisms that are auditorily determined, i.e. whoever talks first or loudest claims the floor. This places the d/Deaf lip-reader in an impossible position of trying to track who is speaking by waiting for others in the group to look at the person who is speaking. Deaf people trying to lip-read in small group interactions must constantly determine who is talking by trying to determine who other group members are looking at. By the time the d/Deaf person has determined who is speaking, the d/Deaf person has already missed the first several seconds of what the speaker has to say. This also means that it is difficult for the d/Deaf person to track who will next claim the floor and is often unable to claim a turn him/herself. Large groups pose even greater problems for the lip-reader: problems such as greater physical distance from the primary speaker, whether or not the primary speaker moves about while talking, variable lighting, and the impossibility of lip-reading questions or comments from anyone in the large group.

When interacting with deaf people who rely on lip-reading to interact in a given situation, one must exercise extra caution to ensure that the deaf person has actually understood the interaction. This is because deaf lip-readers will often nod their heads, which the non-deaf interlocutor takes as a sign of

18

comprehension. However, this is no different than second language users who engage in the same behavior. For example, students who are just learning American Sign Language will often and regularly engage in this behavior when communicating with deaf people. They do this, and deaf people do this, not to deceive the other person, but rather to "save face." That is, they do not want the other person to think they are "stupid" or incompetent. Their reasoning is that if they actually interrupt the other person each time they do not understand, that is precisely the impression they will be creating. They would rather accept the consequences of not comprehending than create an impression of incompetence.

Ideally, someone interacting with a deaf person who is relying on lip-reading must be aware that head nodding may not always signal comprehension. Unfortunately, this is rarely the case. The result is that the two interlocutors leave the interaction with two different impressions of the interaction. The deaf person leaves with "comprehension gaps" while the non-deaf person leaves thinking that the deaf person has fully comprehended.

Given lip-readers' limited comprehension in one-to-one interactions and given the increased interactional complexities in small and large group interactions, lip-reading cannot be assumed to be an effective and meaningful communicative option for d/Deaf people in such settings.

Of course, even if d/Deaf people could lip-read with any reasonable level of accuracy, successful communication in those settings would also require that they then express themselves in intelligible spoken English that, unlike late-deafened adults, they cannot do. Some Deaf people have speech that may be understood in limited contexts; most, however, do not. Despite years of speech training, most Deaf people are generally unable to regulate the volume, timbre or pitch of their speech and that, among other factors, makes their speech very difficult to understand. Deaf people, never having heard themselves speak, cannot monitor their speech in the way that non-deaf people can. Simply put, Deaf

people don't know how words are supposed to sound; without such an auditory target they can only approximate the vocal formulation of words. Thus, the speech of Deaf people has been described as guttural, animalistic, and unintelligible.

Clearly, Deaf people know that their speech is ineffective as a primary means of communication: they know that those unfamiliar with "Deaf speech" have great difficulty understanding their speech; they know not to trust their speech for important interactions; they know that their speech sounds unnatural; and they know that non-deaf people react negatively when they do use their speech. Thus, unlike late-deafened adults, most Deaf people choose not to use their speech for routine communicative interactions because they know it is unintelligible and therefore not an effective means of communication, or in many cases they simply cannot use their speech.

It is true that many late-deafened individuals can be rather skilled lip-readers in some very controlled conditions (although factors listed above will also negatively impact their lip-reading accuracy). This is because, unlike those with childhood onset deafness, they have adult competence in spoken English to assist in making educated guesses. Unfortunately, their higher degree of accuracy at lip-reading coupled with their quite intelligible speech often lead people who are not deaf to conclude that the late-deafened individual is only pretending to be deaf and thus no special communication accommodations are needed or warranted.

Late-deafened adults are very likely to have intelligible speech and, because of their proficiency in English, are able to lip-read with slightly better accuracy. As noted, this often leads people who are not deaf to assume that the late-deafened adult is "faking" their deafness. But, as noted above, late-deafened adults who retain reasonably intelligible speech present a false image to those who are not deaf. They "sound normal" and so the conflation of speech and hearing becomes significant ("if you

20

speak that well, I assume you must be able to hear as well"). That audist stereotype often leads to late-deafened adults being misunderstood and discriminated against because they cannot successfully engage in "normal" communication. That is, while they can express their thoughts in intelligible English, given the severe limitations of lip-reading and their lack of hearing, they are unlikely to understand what is said to them in response to their ideas.

For d/Deaf people as a group, then, lip-reading and speech cannot be assumed to provide a reliable and accurate means of communication in most interactions. It is certainly true that in some context-specific social interactions a variable combination of speech, lip-reading, written words and gestures may enable a rudimentary level of low stakes, social communication (e.g., "change the TV channel," "pass the salt," "lights out"). However a variable combination of speech, lip-reading, written words and gestures would definitely not ensure effective communication in what would be termed "high stakes" interactions. "High stakes" interactions are those in which the risks of miscommunication or misunderstanding are high and the consequences of miscommunications have significant, and possibly severe, negative repercussions for the d/Deaf individual.

Any list of "high stakes" interactions would certainly have to include disciplinary and/or investigative proceedings, medical appointments, mental health appointments (both individual and group counseling sessions), psychological evaluations, any formal evaluation (e.g., behavioral, educational, occupational), education sessions (e.g., specific training sessions, general educational opportunities), religious activities, and instructions concerning health and safety. What these "high stakes" interactions have in common is that discussions, suggestions, courses of action and reliable decisions simply cannot be considered valid unless one can ensure that any communication between parties was conducted in a manner that was accurately conveyed and understood. Given the unreliability of lip-reading, speech and written communication that exists for d/Deaf people, one simply cannot conclude that relying solely on

one or more of those forms of communication can result in accurate and effective communication in "high stakes" interactions.

The clear reality is that the only practical way for Deaf people and for many deaf people to participate effectively in these types of "high stakes" one-to-one interactions, and in any small or large group interaction, is to employ the services of a qualified sign language interpreter.

Because of the importance of qualified sign language interpreters in ensuring access and participation, the next section will examine several aspects of sign language interpretation and misconceptions about the nature of sign language interpreting.

### Summary Of Opinions With Respect To Deaf People As A Linguistic Community:

- Those with little or no knowledge of d/Deaf people or American Sign Language make numerous unfounded, stereotypic assumptions about d/Deaf people, their means of communication and their signed language.

- The most significant factor uniting members of the American Deaf Community is the use of American Sign Language (ASL).

- American Sign Language is neither a manual form nor a derivative form of English, and thus there is not a one-to-one correspondence between American Sign Language signs and English words.

- The grammatical and syntactic structure of American Sign Language is quite different from the grammatical and syntactic structure of English.

- There is no conventional written form of American Sign Language.

- As a group, Deaf people face severe challenges in acquiring competence in spoken or written English, and most Deaf people rarely attain competence in spoken or written English.

- The average literacy level of the American Deaf Community is significantly lower than it is for the population as a whole.

- Lip-reading is so unreliable that it cannot be used to ensure comprehension and effective communication in any group setting or in any "high stakes" one-on-one setting (i.e. interactions related to health, safety, discipline and the like).

- The use of speech for the vast majority of Deaf people is so ineffective that it cannot be relied upon to ensure accurate expression and effective communication.

- Late-deafened adults who have reasonably good lip-reading and speech skills, because of their previous exposure to spoken English, are often thought to be feigning deafness.

- The only way for Deaf people and for deaf people who have learned sign language to participate meaningfully and effectively in all group interactions and in all "high stakes" one-to-one interactions is to provide a qualified sign language interpreter.

D.     Sign Language Interpretation: Misconceptions And Certifications

Given the passage of federal laws beginning in the early 1970s, including the Rehabilitation Act of 1973, it is probably safe to say that most non-deaf people have, at one time or another, seen a sign language interpreter. However, as with other aspects of the lives of d/Deaf people, there are several misconceptions and naïve assumptions surrounding sign language interpreters.

The first is the belief that anyone who can sign can be a qualified sign language interpreter. The fact is that competence in American Sign Language is a necessary, but not sufficient, condition to become a qualified sign language interpreter. This necessary, but not sufficient, condition of bilingualism is true for all interpreters whether of spoken or signed languages, and the literature is quite clear on this point. (e.g. Seleskovitch, 1978; Frishberg, 1986; Wadensjö, 1998; Cokely, 1992; Stewart et al, 1998; Janzen, 2005).

Another common misconception held by those who are not Deaf is that American Sign Language is easy to learn and thus one can rather quickly become a qualified sign language interpreter. However, the fact is that learning American Sign Language is as challenging as learning any spoken language; in fact, given the modality differences, many non-deaf students find it more challenging to learn American Sign Language than to learn a spoken language. (Peterson, 1999).

Another misconception about sign language interpreting is that signs exist in a one-to-one relationship with English words; that is, for every word there is a sign that conveys that word. Were this true, it would mean that interpreting would consist simply of learning the matched signs for the words one already knows and the rather mechanical process of producing the linked signs for the words one hears and, conversely, the spoken words for the signs one sees. However, anyone who has studied another language knows that the vocabularies of any two languages do not map in a one-to-one relationship; this is a cross-cultural and linguistic reality well supported by the literature. [5] Likewise, anyone who has studied American Sign Language knows that ASL and English do not map to each other in a one-to-one relationship, a realization also well supported by the literature. [6]

To begin to understand the cognitive challenges and complexities of interpretation, and why competence in ASL is a necessary, but not sufficient, prerequisite to qualify as an interpreter, it is helpful to have a clear understanding of what interpretation is. The following definition provides such a starting point:

> Interpretation is the competent and coherent use of one naturally evolved language to express the meanings and intentions conveyed in another naturally evolved language for the purpose of negotiating an opportunity for a successful communicative interaction in real time within a triad involving two principal individuals or groups who are incapable of using, or who prefer not to use, the language of the other individual or group.

Cokely, 2001

This is a general definition of interpretation that applies to signed and spoken language interpretation, and one that is well supported in the literature. (e.g., Robinson, 1997; Wadensjö, 1998; Larson, 1998; Stewart et al, 1998; Pöchhacker, 2004; Janzen, 2005). This definition places in proper

---

[5] E.g. Larson 1998; Lyons, 1977; 1995; Duranti, 1997; Crystal, 1997; Hatim and Mason, 1997; Weaver, 1997

[6] E.g. Stokoe, 1965; Cokely, 1992, 2001; McIntire (ed) 1986; Mindess, 1999

context the necessary, but insufficient, condition of bilingualism needed to interpret. Indeed, it is the ability to determine and then express meaning and intention that is at the heart of interpretation.

The cognitive processes by which meaning and intention are determined and then expressed in a different language are quite complex. It has only been in the last quarter of a century that we have begun to understand the process of interpretation; demands of which are such that interpretation has been called "…probably the most complex type of event yet produced in the evolution of the cosmos." (Richards, 1953). While some may say this is hyperbole, it is undeniable that interpretation is an extremely complex cognitive task. In the past three decades, various models of the cognitive process have emerged that have helped shape and guide our understanding of interpretation, research into interpretation, and the training of interpreters (e.g., Moser-Mercer, 1978; Chernov, 1978; Cokely, 1984, 1992; González et al, 1991). Examining any of these models makes clear the fact that excellent skill in both languages is unquestionably a necessary, but not sufficient, prerequisite for interpreters. In fact, in the case of qualified sign language interpreters, national certification by the Registry of Interpreters for the Deaf evolved, in part, to differentiate between those who could sign and those who could interpret (Cokely, 2005).

Interpretation generally takes one of two forms – consecutive or simultaneous. Consecutive interpretation often happens in one-to-one interactions such as doctor's appointments, supervisor meetings and in some legal settings. In diplomatic situations, it may be used when delegates or diplomats deliver speeches. In consecutive interpretation, one of the participants speaks or signs and, at a logical semantic or syntactic point, pauses. The interpreter, who may have been taking notes, then begins to interpret what was just said or signed. When the interpreter is done, the speaker continues until the next pause at which time the interpreter begins. This alternating pattern continues until the speaker is finished. In general, interpreters and participants agree beforehand that the interpretation will proceed

consecutively. In one-to-one interactions, the logical pause points may, for instance, be the conclusion of one of the participant's turns (e.g., asking a question).

Simultaneous interpretation happens without benefit of regular and planned pauses. In simultaneous interpretation the interpretation is delivered in the same general time frame as the original. The term "simultaneous" interpretation is actually a misnomer. No interpretation is delivered perfectly synchronously with the delivery of the original message. Because the interpreter's goal is to render the meaning and intent of the original, that means that the interpreter must first comprehend the original message. To do so requires that the interpreter wait to receive enough of the original message so that the interpreter is confident in the intended meaning of the speaker or signer. Thus, there is always a small temporal discrepancy between the production of the original message and the production of its interpretation because interpreters must necessarily chunk information that is coming to them. This temporal difference is called "lag time" (or sometimes by the French term "décalage").

For at least the last five decades, it has been widely accepted within the Deaf Community and among those who work with Deaf people, including interpreters, that for non-social communicative interactions between Deaf people and those who are not deaf and who cannot sign fluently, consecutive or simultaneous interpretation is the only viable option to ensure that Deaf people have effective communicative access and reliable opportunities for participation. No other reasonable accommodation at the present time can successfully enable Deaf people and those deaf people who can sign to participate in and benefit from small and large group interactions in real time. One has only to look at the prevalence of interpreters in the education, business, religious, entertainment and social service segments of American society to realize the widespread recognition and acceptance of the reality that interpreters are the only viable option for Deaf people in such settings. For example, the presence of on-camera interpreters during Mayor Bloomberg's regular broadcasts to citizens of New York City during

Hurricane Sandy and the growing national discussion about provision of interpreting services during emergency situations are clear indications of the recognition of the importance of interpreters for effective communication for d/Deaf people. At the other end of the spectrum, there was international attention given to the failure to provide effective interpreting services and the use of a faux interpreter at the funeral services for Nelson Mandela.

Late-deafened adults who have learned to sign also benefit from and rely upon the services of qualified sign language interpreters. Such individuals often rely upon the combination of the interpreter's signs and lip-reading the interpreter or the speaker in order to have effective and reliable communicative access, both in small or large group and one-on-one settings. This augmented communication is necessary given the fragmentary nature of lip-reading and the likely fragmentary comprehension of signs by someone who is late-deafened. These sources of information work together in a complementary fashion to ensure a greater level of comprehensibility than either one does alone. Moreover, when acquiring a second language, the norm is that one's comprehension of that language always outpaces one's production of that language (think of young children who can always understand more than they can express).   Accordingly, late-deafened adults who learn sign language generally comprehend the signs of qualified sign language interpreters better than (and faster than) the adult can produce the signs themselves.   Thus, provision of competent interpreters is often necessary to provide communicative rights and access to someone who is late-deafened.

The national professional organization for qualified sign language interpreters in the United States is the Registry of Interpreters for the Deaf (RID). Founded in 1964, RID currently has over 14,000 members nationwide (http://www.rid.org). In 1972, the RID implemented a national evaluation and certification system that would provide a ready means of identifying those individuals deemed qualified to interpret. As mentioned previously, the certification system was motivated, in large part, by

an expressed need to differentiate between those who could sign and those who could interpret (Cokely, 2005). For the past 44 years, the assessment procedures have been implemented, revised and monitored using acceptable psychometric procedures to ensure their validity and reliability

The Registry of Interpreters for the Deaf also certifies interpreters to work in legal settings. According to the RID's 2007 *Standard Practice Paper on Legal Interpreting*:

> Legal interpreting encompasses a range of settings in which the deaf person interacts with various parts of the justice system. Legal interpreting naturally includes court interpreting; however, a legal interpreter's work is not restricted to the courtroom. Rather, legal interpreting occurs during attorney-client conferences, investigations by law enforcement, depositions, witness interviews, real estate settlements, court-ordered treatment and education programs and administrative or legislative hearings. Legal interpreting requires highly skilled and trained specialists because of the significant consequences to the people involved in the event of a failed communication.

> RID, 2007

National assessment and certification of interpreters is a significant factor in ensuring that an individual possesses the range of competences and capabilities needed to render effective interpretation. All languages exhibit sociolinguistic variation. Sociolinguistic variation will include, for example, age variation (senior citizens and teenagers may use different vocabulary), gender variation (men and women may use different vocabulary and grammatical structures) and geographic variation (people from different parts of the country may have distinct accents and/or linguistic patterns). Despite such natural variation, teenagers still communicate with senior citizens, men communicate with women, and people from different parts of the country communicate with each other. The critical point is that naturally occurring sociolinguistic variation does not impede communication among different members of a linguistic community.

American Sign Language, as is true of all signed and spoken languages, also exhibits natural sociolinguistic variation (e.g., Woodward, 1994; Lucas, 2001). This means, for example, that older Deaf people may sign slightly differently than younger Deaf people, Deaf people from the North may sign slightly differently than Deaf people from the South, and Deaf people from various educational backgrounds may sign slightly differently from each other. Nevertheless, just as with spoken English, such naturally occurring linguistic variation does not in any way preclude Deaf people from communicating with each other. Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.

## Summary Of Opinions With Respect To Sign Language Interpretation:

- Competence in American Sign Language and English is a necessary, but not sufficient, condition to become a qualified sign language interpreter.

- The cognitive processes involved in interpretation are extremely complex and require the ability to determine meaning and intent.

- For non-social communicative interactions between Deaf people and those who are not deaf and who cannot sign fluently, consecutive or simultaneous interpretation provided by a qualified interpreter is the only viable option to ensure that Deaf people have effective communication access and have reliable opportunities for participation.

- Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.

- Late-deafened adults who have learned to sign benefit from and rely upon the services of qualified sign language interpreters.

E.      d/Deaf And Hard Of Hearing Inmates At MDOC

Between May and October 2016, I reviewed a number of depositions and all documents/exhibits provided by counsel. On May 3 and 4, 2016, I toured selected portions of MDOC facilities WHV (May

29

3) and DRF and SRF (May 4). During the site visits, I met individually with selected inmates from each facility that I believe reflect a representative sample of all MDOC d/Deaf and hard of hearing inmates. During these interviews I was able to identify difficulties that have arisen for inmates due to a lack of effective communicative access and determine levels of sign language proficiency.

Based on my forty-eight years of experience, my separate meetings with inmates, my inspection of WHV, DRF and SRF, and a review of documents provided to me (see Exhibit B), I believe there are several areas involving a lack of communicative rights and access for MDOC d/Deaf and hard of hearing inmates that warrant examination and discussion. Although the inmates I interviewed have audiological and linguistic differences from the general MDOC inmate population that are not completely identical, there are a number of common issues across all d/Deaf prisoners that require visual accommodations in order to provide them with effective and efficient communicative access.

F.      Necessary Changes For MDOC Regarding Treatment Of d/Deaf And Hard Of Hearing Inmates

        1.      MDOC's Prevailing View Of D/Deaf And Hard Of Hearing Inmates.

Throughout its written policies and procedures, MDOC consistently uses the term "hearing impaired." The use of this umbrella term serves to gloss over significant differences in the levels and types of visual access needed by d/Deaf and hard of hearing inmates. Classifying d/Deaf and hard of hearing inmates as "hearing impaired" is not only an example of audist thinking, but it reinforces the stereotypes and biases discussed above (e.g., literacy levels and lip-reading ability). In this regard, it is not unlike the term "Asian" which glosses over significant cultural and linguistic variation. Using "d/Deaf and hard of hearing" in MDOC written policies and procedures would provide a greater level of precision.

30

It is quite clear from statements in various depositions that the prevailing view within MDOC is that d/Deaf and hard of hearing inmates have "medical issues." This means that communication difference and the need for visual communication is not seen as the primary identifying difference between d/Deaf and hard of hearing inmates and the general inmate population. The fact that MDOC views deafness as a medical issue and not a linguistic or communicative difference has profound, and usually negative, effects regarding the provision of communicative access and effective communication for d/Deaf and hard of hearing inmates. For example, MDOC's Bureau of Health Care Services is responsible for identifying and classifying deaf or hard of hearing inmates (Slagter, pg. 16). The Bureau of Health Care Services is also responsible for providing communication devices and services for deaf and hard of hearing inmates (Slagter, pg. 18).

Consider, for example, that even after initial assessments by medical personnel upon intake or transfer, responsible MDOC personnel still must defer to medical personnel for even the most reasonable requests by d/Deaf and hard of hearing inmates (e.g. Slagter, pg. 13). The results are, at worst, a *de facto* lack of accommodations provided to d/Deaf and hard of hearing inmates or, at best, delays in providing those accommodations.

It is not surprising that MDOC views deafness from a medical deficiency perspective, as this view is prevalent in the way in which d/Deaf and hard of hearing inmates are classified based solely on results of audiological testing. Here it is worth noting that an overly simplistic and erroneous classification system was proposed by Dr. Kerstein based on an inmate's binaural average (e.g. Harbaugh, pg. 52). This proposed classification is not at all in keeping with accepted audiological practice (Harbaugh, pg. 53). The documents I have reviewed make clear that the MDOC classification of d/Deaf and hard of hearing inmates is done solely from a medical perspective. Additionally, the fact that there is no training for MDOC personnel on deafness or d/Deaf and hard of hearing inmates (e.g.,

31

Czinder, pg. 15), means that MDOC personnel are constantly acting on the basis of what is called confirmation bias. That is, as noted above, they begin with uninformed stereotypical notions of d/Deaf and hard of hearing people and they then interpret the behaviors of and grievances by d/Deaf and hard of hearing people in ways that confirm their stereotypic beliefs. Absent meaningful and regular training for all MDOC personnel involved in the intake process, this cycle of confirmation bias continues unchecked. Ultimately this means that MDOC personnel often inaccurately and ineffectively relegate determining the communicative and access needs of d/Deaf and hard of hearing inmates to medical personnel.

I believe that MDOC must provide regular orientation and training sessions to MDOC personnel (officers, counselors, and medical personnel) that present the communicative access rights and needs of d/Deaf and hard of hearing inmates from a social and communicative perspective rather than simply an audist, medical perspective.

2.    *MDOC's Identification Of d/Deaf And Hard Of Hearing Inmates.*

Based on my review of depositions, it appears that MDOC does not have a clear idea how many d/Deaf and hard of hearing inmates there are in the MDOC system at any given time (e.g., Harbaugh, pg. 65; Stewart, pg. 47). Michigan inmates are sent to Duane Waters for audiological exams. When Duane Waters is unable to accommodate testing, inmates are tested by the Allegiance Health system, one of MDOC's contractors (Harbaugh, pg. 56). It seems reasonable to assume that MDOC would be able to determine how many d/Deaf and hard of hearing inmates are in the MDOC system by combining inmates tested at Duane waters and those tested at Allegiance. However, while MDOC has recently begun to assemble a list of d/Deaf and hard of hearing inmates, in March 2015 a spokesperson for Allegiance Health stated, "As contractual providers to MDOC for over 25 years, we have never been asked to keep a registry of hearing impaired prisoners" (Harbaugh, pg. 65).

32

At the facility level it also appears that MDOC does not know who among the inmates is d/Deaf or hard of hearing. For example, MDOC's employee Erika Reeves, who is directly involved with d/Deaf and hard of hearing inmates at WHV, stated that she does not know who is d/Deaf or hard of hearing and learns who is d/deaf or hard of hearing "only by word of mouth" (Reeves, pg. 21). Additionally, Ms. Reeves stated she does not know where d/Deaf and hard of hearing inmates are housed at WHV (Reeves, pg. 118).

I believe that MDOC must regularly and reliably identify all MDOC d/Deaf and hard of hearing inmates, and must maintain a comprehensive system-wide list of d/Deaf and hard of hearing inmates. This list must be readily accessible to all responsible MDOC personnel at both the central and facility levels, and regularly checked for accuracy. Such a statewide list is necessary to prevent delays in providing appropriate accommodations by enabling rapid dissemination of information about changes in MDOC programs, policies or procedures that may impact d/Deaf and hard of hearing inmates. I believe that MDOC must also identify the communicative access needs of each d/Deaf and hard of hearing inmate by engaging the d/Deaf and hard of hearing inmate in that process. Then, MDOC must determine how those needs will be met at the facility at which the inmate is housed. If an inmate changes facilities, his communicative access needs do not change and should follow the inmate to any new facility; what may change is only how the new facility will meet those needs.

　　　　3.　　*MDOC's Assessment Of Effective Communication With d/Deaf And Hard Of Hearing Inmates.*

Based on my review of documents, it is clear that MDOC relies upon several misguided sources for determining effective means of communication with d/Deaf and hard of hearing inmates. First, there is reason to believe that MDOC responsible personnel do not understand what *effective* communication means, or they rely upon stereotypes discussed above for determining how to communicate with d/Deaf and hard of hearing inmates. Among the stereotypes are the assumptions that there are no

communication problems or barriers, and/or that d/Deaf and hard of hearing inmates can read lips fluently (e.g., Brewer, pg. 55) or can hear. MDOC also relies upon untrained staff to determine whether d/Deaf and hard of hearing inmates understand or not. Unless MDOC staff are properly trained and unless d/Deaf and hard of hearing inmates are appropriately involved in communication decisions, MDOC cannot accurately claim that it is providing effective communication for d/Deaf and hard of hearing inmates.

The absence of meaningful training about d/Deaf and hard of hearing people and what is required for communication to be effective with d/Deaf and hard of hearing inmates also affects and influences how d/Deaf and hard of hearing inmates are treated by MDOC personnel. Every inmate I interviewed reported that Correctional Officers mock them, harass them and generally treat d/Deaf and hard of hearing inmates differently than those inmates who are not d/Deaf or hard of hearing. In the absence of meaningful training it is not uncommon for people who are not d/Deaf or hard of hearing to view d/Deaf and hard of hearing people as inferior and incapable. People who are not d/Deaf or hard of hearing very often use d/Deaf and hard of hearing peoples' communication differences to justify their view of d/Deaf and hard of hearing people as inferior or incapable (confirmation bias).

In addition to the personal harassment and teasing of individual d/Deaf or hard of hearing inmates, maltreatment of d/Deaf or hard of hearing inmates reveals itself in other concrete ways: officers' failure to ensure that captioning is on the common room televisions (during my site visits only the television in WHV had captions displayed), officers' failure to reliably alert d/Deaf and hard of hearing to calls/counts (missed calls/counts are discussed later), and officers punishing d/Deaf and hard of hearing inmates when officers give commands/directives behind the backs of d/Deaf and hard of hearing inmates and the inmates fail to comply with those commands.

Given that MDOC personnel receive no information or training on how to assess effective communication with d/Deaf and hard of hearing inmates, nor any information on how to determine whether d/Deaf and hard of hearing inmates comprehend efforts to communicate, it is unclear how MDOC staff can make such determinations reliably. Finally, MDOC responsible personnel operate on the erroneous assumption that medical personnel are qualified to make an assessment of the communication abilities and needs of d/Deaf and hard of hearing inmates. This clearly stems from the fact that MDOC views deafness as a medical issue and not a communication difference. There are, for example, professionals at Gallaudet University, the National Technical Institute for the Deaf, and the Center on Deafness at California State University in Northridge who can provide a comprehensive assessment of the communication abilities and needs of d/Deaf and hard of hearing inmates.

What is particularly notable and troubling is the fact that none of the documents I reviewed indicate any direct involvement of d/Deaf and hard of hearing inmates themselves in determining what means of communication is most effective for them. As noted above, it is simply not possible to determine or infer effective means of communication solely on the basis of an audiological exam, and certainly not by using a flawed classification based on audiological test results. In attempting to determine the communication needs of d/Deaf and hard of hearing inmates, it is most reasonable to believe that the inmates themselves should be consulted on what means of communication are effective for them. The practice of not involving d/Deaf and hard of hearing inmates in identifying their own communication creates and reinforces a pejorative and uninformed audist view that d/Deaf and hard of hearing inmates do not know what constitutes effective communication for them.

I believe that MDOC must develop and implement procedures that ensure that each d/Deaf and hard of hearing inmate is involved in any decisions about what constitutes effective communication for that specific inmate. Once determined, the means of effective communication must be reflected in an

inmate's individualized communication plan. An individualized communication plan would detail what specific means of communication are required for effective communication with that individual inmate and under what circumstances. That plan should be part of the inmate's record and would follow that inmate in the event of transfer to another facility or would be reviewed by any new staff that would have direct contact with that inmate.

4.    *MDOC's Inability To Ensure Communicative Access For d/Deaf And Hard Of Hearing Inmates.*

Based on my 48 years of experience, my tour of MDOC facilities, my interviews with d/Deaf and hard of hearing inmates, and my review of documents, it is clear that MDOC has failed to take adequate steps to ensure that d/Deaf and hard of hearing inmates are being provided effective communication. These lapses have serious, negative consequences for the communicative rights and access needs of d/Deaf and hard of hearing inmates.

The lack of a comprehensive, reliable list of d/Deaf and hard of hearing inmates, the lack of appropriate and regular training and the failure to involve d/Deaf and hard of hearing inmates in determining effective communication means that MDOC cannot ensure it is meeting the communicative access needs of d/Deaf and hard of hearing inmates. To the extent that MDOC personnel are not proactively ensuring that appropriate communication accommodations are being provided for d/Deaf and hard of hearing inmates system-wide, MDOC cannot reliably claim that it is providing effective communication and appropriate access for those inmates.

I believe that MDOC must develop and implement procedures that ensure that appropriately tasked individuals are mandated to act proactively and regularly in order to ensure that MDOC facilities and accommodation decisions are compliant with federal laws. Minimally, this would include a regular statement of all MDOC accommodation decisions for those protected by federal laws, but especially

those decisions regarding the communicative rights and access needs of d/Deaf and hard of hearing inmates. Absent this I believe that MDOC cannot ensure that its facilities are reliably and consistently providing effective communication and appropriate access for d/Deaf and hard of hearing inmates.

      5.    *MDOC's Reliance Upon Written Communication With d/Deaf And Hard Of Hearing Inmates.*

Based on my review of documents and my interviews with d/Deaf and hard of hearing inmates, I believe that MDOC's reliance upon written communication seriously disadvantages d/Deaf and hard of hearing inmates who have limited literacy skills. While reliance upon written communication also disadvantages those inmates who are not d/Deaf or hard of hearing and who possess limited literacy skills, those inmates have other means of readily acquiring needed information (e.g., communicating directly with MDOC personnel or other inmates) that may not be available to d/Deaf and hard of hearing inmates.

There appears to be an assumption by MDOC personnel, including medical and mental health external vendors, that merely providing written material provides effective access for d/Deaf and hard of hearing inmates. I believe this erroneous assumption is based on lack of information and training about d/Deaf and hard of hearing inmates (e.g., Czinder, pg. 15). It appears that MDOC relies upon written communication for a number of recurring activities, for example to file grievances or to request accommodations. To the extent that there are not alternate effective means of, for example, filing grievances, requesting accommodations, and communication with nurses and doctors, MDOC seriously disadvantages d/Deaf and hard of hearing inmates who have limited literacy skills, and MDOC cannot claim to provide effective communication for those inmates.

I believe that MDOC must develop or identify alternate means by which d/Deaf and hard of hearing inmates who have limited literacy skills can conduct routine recurring activities that now must

be conducted in writing. I also believe that these alternate means must be implemented system-wide across MDOC.

      6.    *MDOC's Failure To Provide Necessary Visual Alarms And/Or Signals And Information.*

Based on my tour of MDOC facilities, my review of documents and my interviews with d/Deaf and hard of hearing inmates, I believe that MDOC has failed to provide visual alarms and/or signals, and that such failure poses significant risks for d/Deaf and hard of hearing inmates. My tour of MDOC "designated" facilities for d/Deaf and hard of hearing inmates (WHV, DRF and SRF), revealed no visual alarms and/or signals in any of the areas we were allowed to visit. Those areas included medical areas, inmate common areas and inmate cell areas. In none of these locations did I observe any sort of visual alarms or signaling device. If there are no visual alarms/signals in the "preferred" facilities, one can assume that the non-preferred facilities also have no visual alarms/signals. Indeed, MDOC personnel have admitted that they are not aware whether all facilities that house d/Deaf and hard of hearing inmates have visual alarms/signals (Slagter, pg. 110).

The lack of adequate visual alarms and/or signaling devices in cases of emergencies poses serious and potentially fatal risks for d/Deaf and hard of hearing inmates. The absence of visual alarms means that d/Deaf and some hard of hearing inmates are unable to respond to calls/counts on their own and with the same level of swiftness as non-d/Deaf inmates. Apparently, in the absence of visual alarms, MDOC relies upon MDOC officers and/or non-d/Deaf inmates to alert d/Deaf and hard of hearing inmates of an alarm.

During my interviews of inmates at each facility, d/Deaf and hard of hearing inmates reported that they have missed meals, roll calls and alarms because no one informed them. They also report that they are disciplined (given tickets) when this happens, and that these situations occur frequently.

Clearly, reliance upon MDOC officers and/or non-d/Deaf inmates to alert d/Deaf and hard of hearing inmates is a misguided practice that poses potentially serious risks for d/Deaf and hard of hearing inmates and disadvantages them vis-à-vis inmates who are not d/Deaf or hard of hearing.

It is very clear that, as a group, d/Deaf and hard of hearing inmates are unable to hear and thus unable to respond to spoken announcements or "move/call" signals that are made over a PA system or yelled out by officers. While some hard of hearing inmates, when they have their hearing aids on, may know that an announcement is being made ("sound localization"), they are unable to understand the announcement. Deaf inmates are not even able to discern that an announcement is being made. Thus, as a group, d/Deaf and hard of hearing inmates have no access to information, some of which is potentially life-threatening, that is available to all other inmates. In order for d/Deaf and hard of hearing inmates to be provided with the same level of information, independence and communicative access as non-deaf and hard of hearing inmates, it is my opinion that visible, lighted signal boards must be provided in each of the living quarters. In addition, MDOC should also consider installing bed-shaking devices that would vibrate and physically notify d/Deaf and hard of hearing inmates in the event an emergency occurs while those inmates are asleep.

I believe that MDOC must install visual alarms and signals in all common areas (e.g. visiting areas, medical areas, employment areas, classroom areas, library areas) and, if not in the cell/room of each d/Deaf and hard of hearing inmate, at least in a location that is clearly visible from all parts of the cell/room. Ideally, instead of a simple light or strobe light, MDOC would install lighted message boards that would alert d/Deaf and hard of hearing inmates to the nature of what is being signaled (alarm, lock down, meals, roll call, etc.). And, importantly, the visual alarms and signals installed should be uniform across all facilities so that a d/Deaf inmate transferred to a different facility does not need to learn new alarms and signals.

At WHV, MDOC has installed a page alert system which is designed to function as an alternative to a lighted message board or other visual signaling system. In theory this may provide effective communication for d/Deaf and hard of hearing inmates. In practice, however, it appears that frequently it fails to do so. Each of the WHV inmates I interviewed complained that often messages are "bundled" and sent all together in the late afternoon or early evening. This renders what could be an effective means of communication essentially useless. I believe that MDOC must take steps to ensure and verify that page alert messages at WHV (and at any other facility in which the page alert system is installed) are sent in a timely, reliable manner.

7.     *MDOC's Failure To Provide Interpreters And To Ensure Effective Communication.*

Based on my interviews with d/Deaf and hard of hearing inmates, I conclude that MDOC has failed to provide sign language interpreters for interactions involving d/Deaf and hard of hearing inmates. When asked about interpreters, inmates responses included: no interpreters since 8/12/2013, provided Tuesdays only, none for health care, and no interpreters despite repeated requests. As noted above, d/Deaf and hard of hearing inmates need qualified sign language interpreters in order to communicate effectively in all group interactions and in all "high stakes" (examples described above) one-on-one interactions.

While each of the MDOC inmates I interviewed reported that they required the services of an interpreter in order to communicate effectively, the fact is that MDOC personnel need interpreters as much as the d/Deaf and hard of hearing inmates do. It is not simply one party in an interaction who needs interpretation services; interpreters are needed because the participants do not have a shared language and thus cannot communicate directly or effectively with each other. An interpreter is needed not because someone is d/Deaf or hard of hearing; an interpreter is needed because counselors, doctors, hearing officers, etc. do not know American Sign Language and because d/Deaf and hard of hearing

40

inmates do not have reliable access to spoken English. MDOC's failure to provide interpreters makes it clear that it does not view provision of interpreters as necessary for its personnel to do their jobs. Absent the provision of interpreters, MDOC cannot claim that its counselors, doctors, hearing officers, etc. are able to communicate effectively with d/Deaf and hard of hearing inmates in group interactions and in all "high stakes" one-on-one interactions.

Despite the belief of one MDOC witness that interpreters are typically provided whenever requested (Slagter, pg. 88), the perspective of the inmates I interviewed is quite different. The perspective of d/Deaf and hard of hearing inmates is borne out for at least one MDOC facility: at WVH, interpreters are apparently provided only for mental health programs (Reeves, pg. 85).

The cancellation of the statewide interpreter contract with Linguistica resulted in a significant gap in the provision of interpreting services in at least certain facilities. The contract was cancelled as of July 1, 2015 and at DRF, for example, a new vendor was not retained until March 2016 (Campbell, pg. 58). One can only wonder how many "high stakes" interactions occurred during that nine-month period in which d/Deaf or hard of hearing inmates lacked access to interpreters. It is unclear what the gap was at the other two facilities.

MDOC's failure to provide interpreters was reported at all three facilities. Inmates I interviewed at all three facilities reported that interpreters are not routinely provided for "high stakes" interactions. One of the inmates interviewed at WHV reported that an "inmate interpreter" was used on more than one occasion.

Here it is worth stressing that there is a difference between "social signers" (i.e. individuals who know how to sign and may, in some very limited and low risk situations be able to facilitate communication between d/Deaf and hard of hearing people and non-deaf people) and qualified, certified

41

interpreters. The level of competence achieved by these "social signers" is clearly not the level of fluency required to interpret with accuracy, fidelity and fluidity, which are necessary for effective communication.

Without proper training, these "social signers" turned interpreters are likely to be unaware of the linguistic and structural differences between ASL and English. They also are likely to think that the goal of interpreting is nothing more than rendering a sign for each word they hear or vice versa, when the essence of interpretation lies in determining meaning and intent and, as discussed above, discarding the form (i.e. the words or signs) of the original message. Finally, these "social signers/faux interpreters" are likely to be unable to manage and control lag time in order to deal with more structurally dense or complex messages.

Another, perhaps more important issue that must be considered is that employee "social signers/faux interpreters" will often have an interest in the material that they are signing or speaking. Someone acting as an interpreter who has a vested interest in the outcome of an interaction (e.g. a disciplinary meeting) will be unable to maintain the level of neutrality and objectivity required to accurately communicate the interaction. By contrast, certified interpreters provide a level of measured, objective neutrality in their work, while signing co-workers or fellow inmates may be unable to do so. Like doctors and lawyers, certified interpreters are bound by a professional code of ethics and conduct and pledge to maintain confidentiality, neutrality, impartiality and objectivity in their work (http://rid.org/ethics/code-of-professional-conduct/); "social signers/faux interpreters" are bound by no such code of ethics or ethical code of conduct.

I believe that in order to have meaningful and effective communication between MDOC employees and d/Deaf and hard of hearing inmates in all group interactions and an in all "high stakes"

one-on-one interactions, and to provide communicative access to educational and therapeutic programming throughout the MDOC system, MDOC must provide sign language interpretation by qualified sign language interpreters.

        8.     *MDOC's Failure To Provide Valid And Reliable Communication Assessments.*

Based on my review of exhibits submitted, my knowledge and experience, and my review of depositions, I believe that MDOC's audist actions clearly speak louder than its words in the matter of valid and reliable language/communication skills and needs assessments of d/Deaf and hard of hearing inmates. MDOC personnel's view of d/Deaf and hard of hearing inmates means that, as noted above, they rely on medical personnel to determine whether interpreting services are needed for individual d/Deaf or hard of hearing inmates. This means that the determination of effective means of communication with d/Deaf and hard of hearing inmates lies in the hands of medical personnel who, more than likely, do not know American Sign Language and, more importantly, do not know how to assess effective communication when interacting with d/Deaf and hard of hearing inmates. The determination of effective means of communication with d/Deaf and hard of hearing inmates should be made by language or communication specialists who are fluent in sign language and by d/Deaf and hard of hearing inmates themselves.

Based on my review of documents it appears that no one at MDOC is responsible for assessing overall communication/language skills and that there is no clear assessment of ASL proficiency for d/Deaf and hard of hearing inmates by MDOC. The failure to validly assess the language and communication of d/Deaf and hard of hearing inmates means that individualized communication plans, if they exist at all, are inaccurate, incomplete and compromised.

Without valid language and communication assessments, d/Deaf and hard of hearing inmates are significantly disadvantaged relative to inmates who are not d/Deaf or hard of hearing, and are also

denied opportunities available to inmates who are not d/Deaf or hard of hearing. The fact that one uses another language, spoken or signed, is in no way an accurate or valid indicant of one's capabilities. What is valid is that if those whose first language is "sign language" are not provided appropriate and effective means of communicative access to various services and programming (e.g. educational and vocational), they will not be able to successfully access such services or programming. The fault lies not in those whose first language is "sign language" but rather in the failure of MDOC to provide effective communicative access to services and programs.

I believe that MDOC must provide language/communication skills and needs assessments of d/Deaf and hard of hearing inmates by qualified individuals, and that the process for determining what language/communication skills and needs assessments of d/Deaf and hard of hearing inmates require for effective communication to occur must include those d/Deaf and hard of hearing inmates.

9.      *MDOC's Lack Of VRI Is Problematic And Inadequate.*

Based on my tour of MDOC facilities, my review of documents and my interviews with d/Deaf and hard of hearing inmates, I believe that MDOC's failure to use Video Remote Interpreting (VRI) services for emergency "high stakes" interactions (e.g. medical and disciplinary) is inadequate, ineffective and problematic. There was a short-lived use of VRI (using an iPad) as a substitute for in-person interpreting in at least WHV (Slagter, pg. 91). At another facility it was reported that the internet speed was problematic and thus VRI was not functional at that facility (Slagter, pg. 91). These iPad solutions rely upon wireless connectivity. Reliance on wireless connectivity in certain facilities may mean that VRI cannot be a reasonable alternative to in-person interpreting. However, in those facilities I believe that MDOC must use hard-wired Ethernet connectivity to ensure reliable VRI access.

Even if the apparent bandwidth issue could be addressed (as it should be), the physical size of the "preferred" facilities makes dedicated VRI units in the medical areas, disciplinary/hearing rooms and

individual counseling rooms appropriate. Absent this, MDOC cannot claim to provide d/Deaf and hard of hearing inmates with effective communication and a comparable level of communicative access as is enjoyed by non-d/Deaf and hard of hearing inmates.

To the extent that MDOC personnel are not using VRI for complete "high stakes" (e.g. medical and disciplinary) interactions whenever in-person interpreting is not available, MDOC cannot claim to be providing effective communication with d/Deaf and hard of hearing inmates in such interactions.

I believe that in order to have meaningful and effective communication between MDOC personnel and for d/Deaf and hard of hearing inmates via VRI, MDOC must ensure that the internet bandwidth is sufficient to provide reliable video access. I also believe that in order to provide rapid response to unscheduled "high stakes" interactions, MDOC must have VRI units in the medical, disciplinary and counseling areas of each facility that has a d/Deaf or hard of hearing inmate.

10.    *MDOC's Provision Of Telephonic Access Is Problematic And Ineffective.*

Based on my tour of MDOC facilities, my experience and knowledge, my review of documents and my interviews with d/Deaf and hard of hearing inmates, I believe that MDOC's current practices and procedures provide d/Deaf and hard of hearing inmates with significantly less equivalent and effective telephonic access than inmates who are not d/Deaf or hard of hearing.

In particular, d/Deaf and hard of hearing inmates in MDOC facilities are provided limited access to a TTY relative to the access other inmates have to regular telephones. There are several limitations to TTYs, however. One limitation is that this direct point-to-point TTY communication requires that both parties have TTYs. Although TTYs and free, federally mandated TTY relay services have, in the past, provided a significant level of communication access for d/Deaf and hard of hearing people, the fact is that TTY technology has essentially become obsolete for reasons discussed below. Because TTYs are

45

obsolete, it is increasingly unlikely that those with whom MDOC d/Deaf and hard of hearing inmates wish to communicate will even own TTYs. Also because a TTY conversation is typed, TTY conversations always take more time than if the conversation had been spoken or signed.

In addition to the limitations described above, for different reasons, a TTY does not provide MDOC d/Deaf and hard of hearing inmates with effective communication with those outside MDOC. In order to use a TTY effectively, the user must be proficient in written English and, as described above, many d/Deaf and hard of hearing inmates do not communicate effectively in English. For many d/Deaf and hard of hearing inmates who have intelligible speech and proficiency in reading English, new telephone technology exists that would provide them with a level of communicative access equivalent to other inmates. This technology, captioned telephone (CapTel), allows a d/Deaf or hard of hearing caller with intelligible speech to place a telephone call to anyone who has a regular telephone. Using CapTel, inmates would place their call and speak directly to the other party. The other party would then speak in response to the inmate. The other party's spoken response would then be converted to on-screen text that the inmate could read. For late-deafened, educated native speakers of English who possess the literacy skills necessary, the use of CapTel would give them an equivalent level of telephonic access as other non-deaf inmates. It is my opinion that to ensure effective communication, MDOC must provide d/Deaf and hard of hearing inmates who have intelligible speech and proficiency in English with CapTel access equivalent to the level of access as other non-deaf inmates have to regular telephones.

For some d/Deaf and hard of hearing inmates, CapTel is not a viable option because of the inmates' unintelligible speech and extremely limited English proficiency. During the past 10 to 15 years, Deaf people have eagerly and quickly replaced TTYs with Videophones (VPs) for two very understandable reasons. First, TTYs require communication in typed English (the second language for most d/Deaf and hard of hearing people and a language in which, as noted above, they rarely attain any

significant level of fluency). Second, because TTY conversations are typed, those conversations take significantly longer and thus when d/Deaf or hard of hearing people use TTYs they tend to keep conversations very brief (e.g. to make arrangements to meet in person). VPs, by contrast, enable d/Deaf and hard of hearing people to communicate using American Sign Language, a language in which they are much more comfortable and fluent. Thus their VP conversations are not encumbered by written English nor slowed by having to type. Signed VP conversations are analogous to spoken telephone conversations.

If each party has a VP then they can communicate directly; however, if only one party has a VP then communication with the party who does not have a VP is only possible using a free Video Relay Service (VRS), which utilizes the same hardware/software as the VP. Either party can initiate communication by connecting with a VRS provider and a VRS interpreter will facilitate the call, communicating via VP with the d/Deaf or hard of hearing caller and via voice with the non-deaf caller. If calling someone who does not have a VP, d/Deaf and hard of hearing inmates could use the VP to call a VRS center where a qualified ASL interpreter would answer. The d/Deaf or hard of hearing inmate would then provide the phone number he or she wishes to call, and the ASL interpreter would place the call. The d/Deaf or hard of hearing inmate would sign to the interpreter who would then interpret into spoken English for the non-deaf person on the other end of the phone line, and also interpret that person's spoken English into ASL for the d/Deaf or hard of hearing inmate.

There is no cost to the individual for using VRS other than the cost of internet connectivity. The Federal Communications Commission (FCC) established the Telecommunications Relay Fund to fund the costs of Telecommunication Relay Services (established under Title IV of the Americans with Disabilities Act). Funding comes from rate adjustments or surcharges on local telephone bills that are set annually by the FCC. Companies that offer Video Relay Services (VRS) are paid from the TRS fund and

those companies provide free Videophone equipment to d/Deaf individuals and companies/entities with d/Deaf employees. In addition to the fact that the only cost for a VP is the internet connection, a major advantage is that VPs allow Deaf people to communicate directly in ASL. A secure VP that is as accessible to d/Deaf and hard of hearing inmates as telephones are to non-deaf inmates is necessary to provide them the same level of telephonic access as is provided to non-deaf inmates.

A d/Deaf and hard of hearing inmate's access to effective telephonic communication cannot be determined simply by the results of an audiogram or an overly simplistic classification. For all of these reasons it should be clear why d/Deaf and hard of hearing inmates must be involved in determining what counts as effective communication.

It is my opinion that in each facility housing d/Deaf and hard of hearing inmates, MDOC must make at least one CapTel phone available to d/Deaf and hard of hearing inmates who have telephonically intelligible speech to make it possible for them to access point-to-point telephone calls. Further, I believe that MDOC must provide access to VPs for d/Deaf or hard of hearing inmates and access to Video Relay Service (VRS) providers in order for them to have telephone services and benefits that are equivalent to those afforded non-deaf inmates. Provision of a VP would also help reduce the communicative isolation of some d/Deaf or hard of hearing inmates because they would be able to communicate directly with other Deaf people or with fluent interpreters.

### 11.   Inadequate Or Non-Existent MDOC Policies And Procedures.

Based on my knowledge and experience, my tour of MDOC facilities, my interview with d/Deaf and hard of hearing inmates and my review of documents, I have found that many of MDOC's failures in ensuring effective communication with/by d/Deaf and hard of hearing inmates are a result of MDOC's failure to implement, and ensure the consistent application of, adequate system–wide institutional policies and procedures concerning those inmates. MDOC should have in place policies and

procedures that, at the very least: (1) ensure an in-depth assessment of the communication needs of the inmate as soon as possible upon entry into the prison system, (2) ensure adequate and reliable tracking of d/Deaf and hard of hearing inmates as they move throughout the system, (3) ensure notification of facility level officials upon the arrival of a d/Deaf or hard hearing inmate at their facility, (4) provide comprehensive guidelines for the provision of all necessary accommodations to d/Deaf and hard of hearing inmates (not merely piecemeal guidelines or procedures that address limited accommodations at certain facilities that house d/Deaf and hard of hearing inmates), and (5) require annual audits to evaluate compliance and allow for improvement.  The current lack of such policies and procedures, and the failure to recognize the lack of and need for such policies and procedures, has resulted in a system in which there is no uniform approach to providing the accommodations needed to ensure effective communication with d/Deaf or hard hearing inmates.

### 12.    *Providing Adequate Communicative Access.*

Here it is worth noting that at least one other state prison system has taken appropriate steps to address access issues of d/Deaf and hard of hearing inmates. As my cv indicates, in 2010 I was an expert witness in a class action lawsuit against the Virginia Department of Corrections (Minnis, et al. v Virginia Department of Corrections, Civil Action No. 1:10cv96 (E.D. Va.)). The issues faced by Virginia d/Deaf and hard of hearing inmates are the same issues faced by d/Deaf and hard of hearing inmates in Michigan. In 2010 the Virginia Department of Corrections entered into a settlement agreement that, in my opinion, committed VDOC to provide appropriate and adequate remedies to these access issues. I believe that this agreement serves as a model for providing effective communication and communication access.

Given that MDOC does not provide d/Deaf and hard of hearing inmates with appropriate visual alarms/signals, has not provided d/Deaf and hard of hearing inmates with an equivalent level of

telephonic communication as enjoyed by other inmates, and has not provided d/Deaf and hard of hearing inmates with regular services of qualified interpreters, I believe that the following remedies must be put in place in order for MDOC d/Deaf and hard of hearing inmates to have a level of effective communication and a level of communicative access similar to that enjoyed by inmates who are not d/Deaf or hard of hearing:

a)  I believe that MDOC must provide qualified, professional, credentialed interpreters for all "high stakes" interactions involving d/Deaf and hard of hearing inmates which clearly include, but are not limited to, disciplinary and investigative meetings, medical appointments and visits, appointments with psychologists/psychiatrists and/or other mental health professionals, offender treatment programming, meetings with facility administration, meetings with counselors, religious activities, classes and/or educational opportunities. In my opinion, failure to do so means that MDOC cannot accurately state that it is providing d/Deaf and hard of hearing inmates with "qualified interpreters" needed to permit meaningful and effective communication. In addition to high stakes situations as discussed above, all "public" events and group settings such as classes and/or educational opportunities or group meetings clearly require professional interpreting services for d/Deaf or hard of hearing inmates.

b)  I believe that MDOC must provide those d/Deaf or hard of hearing inmates who have telephonically intelligible speech and are literate in English with access to a captioned telephone (CapTel) that will allow them the same level of telephonic freedom experienced by non-deaf

inmates. This will enable those d/Deaf and hard of hearing inmates to place approved calls directly to friends, family and other individuals or businesses with whom they may wish to have contact — the same telephonic access provided to non-deaf inmates.

c)   I believe that MDOC must provide d/Deaf or hard of hearing inmates who do not have telephonically intelligible speech or who do not possess sufficient literacy to use CapTel with access to a Videophone (VP). This will allow them the same level of telephonic freedom experienced by non-deaf inmates by enabling them to place approved calls directly to those who also have a VP or, using the free FCC-funded VRS interpreters, to place calls to friends, family and other individuals or businesses with whom they may wish to have contact who do not have a VP.

d)   I believe that MDOC must install Video Remote Interpreting (VRI) units in strategic locations in each facility that houses a d/Deaf or hard of hearing inmate, given that it is not reasonable or practical for MDOC to have on-staff interpreters present at all times. While it is true that, for most interactions, a physically present interpreter is preferred whenever possible, technology now offers this additional option.

e)   In my opinion, the installation of VRI equipment at least in the medical facilities office and rooms in which disciplinary and counseling meetings might occur is necessary to provide an appropriate level of communicative access for d/Deaf and hard of hearing inmates and would provide that

access in an immediate and timely manner. VRI service is an on-demand service, available seven days a week, twenty-four hours per day, and some companies will bill only for minutes used rather than to the nearest half hour. Using VRI to supplement the physically present interpreter, d/Deaf and hard of hearing inmates and officials at MDOC facilities will never have to experience inordinate and inappropriate delays in being able to communicate efficiently and effectively with each other in such settings. This will also ensure that in these "high stakes" settings MDOC is able to provide an interpreter who is able to interpret "effectively, accurately and impartially" both receptively and expressively, "through the use of any necessary specialized vocabulary." (http://www.ada.gov/taman3.htm.)

It is my opinion that VRI should be used to supplement, but not replace, regularly scheduled physically present interpreters. There are a number of interpreted interactions that are best handled with a physically present interpreter or will occur in physical locations not equipped for VRI. These interactions must be analyzed to determine the number of hours for which a physically present interpreter is scheduled.

## IV.   CONCLUSIONS WITH RESPECT TO TREATMENT OF D/DEAF OR HARD OF HEARING INMATES IN MDOC FACILITIES.

Direct communicative interaction:

- The fact that a d/Deaf or hard of hearing person uses his/her speech in certain restricted interactions cannot be taken as an indication that that person does not require the services of an ASL/English interpreter in order to have effective communication.

52

- The fact that a d/Deaf or hard of hearing person is able to lip-read in certain restricted interactions cannot be taken as an indication that that person does not require the services of an ASL/English interpreter in order to have effective communication.

- Reliance upon verbal commands, announcements and signals is an inefficient and ineffective means of communicating with many d/Deaf or hard of hearing inmates.

- Reliance upon announcements made over a PA system to signal all moves and provide other information is not an effective way to communicate with d/Deaf and hard of hearing inmates.

- Provision of a visual alarms/alert notification system (e.g., lighted message board) is necessary to ensure effective and efficient communication with d/Deaf and hard of hearing inmates.

Telephonic access:

- Provision of CapTel functionality is necessary to provide equivalent telephonic services to d/Deaf and hard of hearing inmates who have telephonically intelligible speech and a level of literacy.

- Provision of a Videophone and access to a Video Relay Service is necessary to provide equivalent telephonic services to d/Deaf and hard of hearing inmates unable to use CapTel.

Provision of interpreting services:

- Provision of qualified sign language interpreter services is the only way to provide d/Deaf and hard of hearing inmates with access and effective communication for the same educational, training and self-improvement programs available to inmates who are not d/Deaf or hard of hearing.

- Video Remote Interpreting (VRI) is the best way to provide d/Deaf and hard of hearing inmates with effective and equivalent access to "an interpreter who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary" in high stakes, "emergency" situations.

- VRI equipment in the nurse's office, warden's office and other key locations in each MDOC facility that houses d/Deaf and hard of hearing inmates, may be the only way for MDOC to provide effective communication in emergency situations.

- VRI should only be used in "last minute/emergency" situations in which an interpreter is needed. VRI should not be viewed as a replacement for physically present interpreters at most scheduled high stakes and "public" situations.

MDOC personnel training:

- A mandatory information, orientation and education program for MDOC personnel who are responsible for, or have need to interact with d/Deaf and hard of hearing inmates is necessary to address any stereotypes and audist biases and to promote the level of understanding of issues and needs of d/Deaf and hard of hearing inmates that will ensure nondiscrimination.

MDOC policies and procedures:

- A review of all MDOC policies and procedures, with appropriate modifications where warranted, is necessary to ensure that d/Deaf and hard of hearing inmates are not systematically disadvantaged relative to inmates who are no d/Deaf or hard of hearing.

## V.   <u>SUMMARY</u>

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Community is American Sign Language. Many people who are not deaf have stereotypical and audist misconceptions about Deaf people and American Sign Language. They believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when in reality the level of accuracy for most d/Deaf people is 30% at best. Those who are not deaf believe that Deaf people can read and write English fluently when in reality the average Deaf person reads at approximately a fourth-grade reading level. Those who are not deaf fail to understand that in order for communication with d/Deaf inmates to be effective and efficient it must be visually clear and unambiguous.

MDOC has not installed a sufficient number of visual alarms or signals in the "preferred" facilities for d/Deaf and hard of hearing inmates and it is reasonable to conclude that such visual access does not exist at other facilities. Light boards that would display specific inmate "moves" or "calls" (e.g., counts, chow) would provide d/Deaf and hard of hearing inmates with the same access to information provided to non-deaf inmates by hearing PA announcements. Alternately, the page alert system, if appropriately and reliably implemented, might provide an acceptable alternative.

For meaningful, high stakes interactions, communicative access for d/Deaf and hard of hearing inmates must be provided by employing the services of a qualified sign language interpreter. In addition to physically present interpreters, technology has made it possible to use the services of Video Relay Services (VRS) or a Video Remote Interpreter (VRI), when it is impractical to have a physically present interpreter. VRI provides the only meaningful way to ensure accurate and effective communication in "last minute" emergency situations.

The only way to provide d/Deaf and hard of hearing inmates who do not have telephonically intelligible speech and a level of literacy with telephone services and benefits equivalent to those afforded non-deaf inmates is the provision of a Videophone and access to Video Relay Services.

The only way to provide d/Deaf and hard of hearing inmates who have telephonically intelligible speech and a level of literacy with telephone services and benefits equivalent to those afforded non-deaf inmates is the provision of CapTel telephone services.

Based on my 48 years' experience with the Deaf Community and my review of the record, I believe that MDOC has denied d/Deaf and hard of hearing inmates access to effective communication. Based on my experience, I believe that d/Deaf and hard of hearing inmates housed in MDOC facilities are the victims of audism.

I believe that MDOC must regularly review all of its policies and procedures and revise them where necessary to ensure that d/Deaf and hard of hearing inmates are not systematically oppressed and discriminated against d/Deaf and hard of hearing inmates.

Lack of information about Deaf people, their language and their culture on the part of MDOC employees appears to play a major role in their decisions to deny or restrict access for d/Deaf and hard of hearing inmates to programs and services available to non-deaf inmates. One way to address lack of

55

information and ignorance about Deaf people, their language and their culture is to implement regular awareness-training programs. Among other topics, these training programs should address the stereotypes and biases about d/Deaf and hard of hearing people discussed above (e.g. levels of literacy and lip-reading) and the need for visual access.

Finally, as additional information becomes available, I expect to examine that material and expand upon or revise the opinions offered in this report as appropriate.

Dennis Cokely
Date:  October 28, 2016

**VI.**     **REFERENCES**

**Publications**

1.    Alaska Justice Forum 24(2): 2-4. National Assessment of Adult Literacy and Literacy Among Prison Inmates. Justice Center, University of Alaska Anchorage. (Summer 2007).

2.    Baker, Charlotte and Robbin Battison (eds.). 1980. *Sign Language and the Deaf Community: Essays in Honor of William C. Stokoe*. Silver Spring, MD: National Association of the Deaf.

3.    Baker-Shenk, Charlotte and Dennis Cokely. 1980. *American Sign Language: a Teacher's Resource text on Grammar and Culture*. Washington, DC: Gallaudet University Press.

4.    Bernstein, Lynne and Edward Auer, Jr. 2003. "Speech Perception and Spoken Word Recognition." In Marschark and Spencer (eds.) *Deaf Studies, Language, and Education*. New York: Oxford University Press.

5.    Brown, C. M. (1988). Human-computer interface design guidelines. Norwood, NJ: Ablex Publishing.

6.    Charrow, Veda. 1974. Deaf English: An Investigation of the written English Competence of Deaf Adolescents. Unpublished dissertation. Stanford University.

7.    Charrow, Veda. 1975. "A Psycholinguistic Analysis of 'Deaf English'. Sign Language Studies 4:7 pg.139-149.

8.    Chernov, Ghelly. 1978. Inference and Anticipation in Simultaneous Interpreting. Philadelphia, PA: John Benjamins.

9.    Cokely Dennis. 2005. "Shifting Positionality: a Critical Examination of the Turning Point in the Relationship of Interpreters and the Deaf Community." In: Marschark, Peterson, and Winston, (eds): *Sign language Interpreting and Interpreter Education: Directions for Research and Practice*. Oxford: Oxford University Press.

10.   Cokely, Dennis. 1992. Interpretation: A Sociolinguistic Model of the Interpretation Process. Burtonsville, MD: Linstok Press

11.   Cokely, Dennis. 2001 "Interpreting Culturally Rich Realities: Research Implications for Successful Interpretation." *Journal of Interpretation*: Millennial Edition 1-46.

12.   Costello, Elaine. 1995 *Signing: How to Speak with Your Hands.* New York, NY: Bantam Books

13.   Crystal, David. 1997. *The Cambridge Encyclopedia of Language*. Cambridge, UK: Cambridge University Press.

14.  deVilliers, P. and S. Pomerantz. 1992. "English Literacy Development in Deaf Children: Directions for Research and Intervention." In J. Miller (ed.) Research on child Language Disorders: A Decade of Progress. Austin, TX: Pro-Ed.

15.  Duranti, Alessandro. 1997. *Linguistic Anthropology*. Cambridge, UK: Cambridge University Press.

16.  Frishberg, Nancy. 1986. *Interpreting: An Introduction*. Silver Spring, MD: RID Publications.

17.  Gates, George and John Mills. 2005. "Presbycusis." *The Lancet*: 366(9491), 1111-1120

18.  González R.D., V.F. Vásquez and H. Mikkelson. 1991. *Fundamentals of court Interpretation: Theory, Policy and Practice*. Durham, NC: Academic Press.

19.  Hatim, Basil and Ian Mason. 1997. *The Translator as Communicator*. New York: Routledge.

20.  Jankowski, Katherine. 2002. *Deaf Empowerment: Emergence, Struggle, and Rhetoric*. Washington, DC: Gallaudet University Press.

21.  Janzen, Terry (ed.). 2005. Topics in signed Language Interpreting. Philadelphia, PA: John Benjamins.

22.  Karchmer, Michael A. and Ross E. Mitchell. 2003. "Demographic and Achievement Characteristics of Deaf and Hard-of Hearing Students." In Marschark and Spencer (eds.) *Deaf Studies, Language, and Education*. New York: Oxford University Press.

23.  Klare, G.R. (1974). "Assessing readability." *Reading Research Quarterly*: 10(1), 62-102.

24.  Klare, George R. "Readability." *Handbook of Reading Research*. P. David Pearson, et al. (eds.) New York: Longman, 1984. 681-744.

25.  Klima, Edward and Ursula Bellugi 1979. *The Signs of Language*. Cambridge, MA: Harvard University Press.

26.  Kruger, Justin and David Dunning. 1999. "Unskilled and unaware of it: How Difficulties in Recognizing One's Own Incompetence Lead to Inflated Sel-Assessments. Journal of Personality and Social Psychology. Volume 77 (6) 1121-1134

27.  Lane, Harlan. 1984. *When the Mind Hears: A History of the Deaf*. New York: Random House.

28.  Lane, Harlan. 1992. Mask of Benevolence: Disabling the Deaf Community. New York: Knopf.

29.  Lane, Harlan, Richard Pillard and Ulf Hedberg. 2011. *The People of the Eye: Deaf Ethnicity and Ancestry*. New York: Oxford University Press

30. Larson, Mildred. 1998. *Meaning-Based Translation: a Guide to Cross-Cultural Equivalence*. Lanham, MD: University Press of America.

31. Liben, Lynn. 1978. *Deaf Children: Developmental Perspectives*. New York: Academic Press.

32. Lucas, Ceil. 2001. *The Sociolinguistics of the Deaf Community*. Cambridge, UK. Cambridge University Press.

33. Lyons, John. 1977. *Semantics*. Cambridge, UK: Cambridge University Press.

34. Lyons, John. 1995. *Linguistic Semantics: An Introduction*. Cambridge, UK: Cambridge University Press.

35. Marschark, Marc and Patricia Elizabeth Spencer (eds.). 2003. *Deaf Studies, Language, and Education*. New York: Oxford University Press.

36. McIntire, Marina (ed.). 1986. *Interpreting: The Art of Cross-Cultural Mediation*. Silver Spring, MD: RID Publications.

37. Mindess, Anna. 1999. Reading Between the Signs: Intercultural Communication for Sign Language Interpreters. Yarmouth, ME: Intercultural Press.

38. Moser-Mercer, Barbara. 1978. "Simultaneous Interpretation: A Hypothetical Model and Its Practical Application." In Gerver & Sinaiko (eds.). *Language Interpretation and Communication*. New York: Plenum Press

39. Padden, Carol and Tom Humphries. 1989. *Deaf in America: Voices from a Culture*. Cambridge, MA: Harvard University Press.

40. Padden, Carol and Tom Humphries. 2005. *Inside Deaf Culture*. Cambridge, MA: Harvard University Press.

41. Peterson, Rico. 1999. *The Perceptions of Deafness and Language Learning of Incoming ASL Students*. Unpublished dissertation. University of California, Riverside.

42. Pöchhacker, Franz. 2004. *Introducing Interpreting Studies*. London: Routledge.

43. Registry of Interpreters for the Deaf. 2007. Interpreting in Legal Settings

44. Richards, I. 1953. "Towards a Theory of translating" American Anthropological Association, Studies in Chinese Thought 55 (Memoir 75): 247-262.

45. Robinson, Douglas. 1997. *Becoming a Translator*. New York: Routledge.

46. Rutherford, Susan. 1993. A Study of American Deaf Folklore. Burtonsville, MD: Linstok Press.

47. Seleskovitch, Danica. 1978. *Interpreting for International Conferences*. Washington, DC: Pen and Booth.

48. Schein, Jerome. 1996. "The Demography of Deafness" in Higgins and Nash (eds) *Understanding Deafness Socially*. Springfield, IL: Charles C. Thomas,

49. Settlement Agreement, *Minnis, et al. v Virginia Department of Corrections*, Civil Action No. 1:10cv96 (E.D. Va. Oct. 13, 2010).

50. Spingarn, Tracie. 2001 "Knowledge of Deaf Community-Related Words, Symbols and Acronyms among Hearing People: Implications for the Production of an Equivalent Interpretation." *Journal of Interpretation*: Millennial Edition 69-84.

51. Stewart, Davis, Jerome Schein and Brenda Cartwright. 1998. *Sign Language Interpreting: Exploring Its Art and Science*. Needham Heights, MA: Allyn Bacon.

52. Stokoe, William, Dorothy Casterline and Carl Croneberg. 1965. *A Dictionary of American Sign Language on Linguistic Principles*. Washington, DC: Gallaudet University Press.

53. Valli, Clayton, Ceil Lucas and Kristin Mulrooney. 2005. *Linguistics of American Sign Language*. Washington, DC: Gallaudet University Press.

54. Wadensjö, Cecilia. 1998. *Interpreting as Interaction*. New York. Addison Wesley Longman.

55. Weaver, Gary. 1997. Culture, Communication and Conflict: Readings in Intercultural Relations. Boston, MA: Pearson Publishing.

56. Woodward, James C. 1972. "Implications for Sociolinguistic Research among the Deaf." *Sign Language Studies* 1:1-7.

57. Woodward, James. 1978. "Historical Bases of American Sign Language." In P. Siple (ed) *Understanding Language Through Sign Language Research*. New York: Academic Press.

58. Woodward, James C. 1994. Describing Variation in American Sign Language: Implicational Lects on the Deaf Diglossic Continuum. Silver Spring, MD: Linstok Press.

59. Wrigley, Owen. 1996. *The Politics of Deafness*. Washington, DC: Gallaudet University Press.

**<u>Websites</u>**

1. Video Analysis Software

   - http://www.bu.edu/asllrp/SignStream/
   - http://www.interpretereducation.org/wp-content/uploads/2013/02/Practitioner_FINAL_REPORT_021513.pdf

2. Registry of Interpreters for the Deaf
   - http://www.rid.org

3. Americans with Disabilities Act Technical Assistance Manual
   - http://www.ada.gov/taman3.htm