## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

_____

MARY ANN MCBRIDE, et al.,  )
          )
   *Plaintiffs*,   )
          ) Civil Action No. 2:15–cv–11222
v.         )
          ) Hon. Sean F. Cox
MICHIGAN DEPARTMENT  ) Mag. David R. Grand
OF CORRECTIONS, et al.,   )
          )
   *Defendants*.   )
_____ )

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Plaintiffs assert that the following material facts are not in dispute in this case and thus mandate summary judgment:

### <u>PARTIES</u>

1. Plaintiffs Mary McBride and Ralph Williams are deaf or hard of hearing prisoners who are in the custody of the Michigan Department of Corrections ("MDOC"). *See, e.g.*, Ex. A, at 4–6 (Plaintiff McBride's Objections and Responses to Defendants' First Set of Interrogatories, Responses 1–2); Ex. B, at 3–6 (Plaintiff Williams'

Amended Objections and Responses to Defendants' First Set of Interrogatories, Response 2).[1]

2.  Defendant MDOC is a Michigan state agency that receives federal funds for a variety of programs.  Ex. D, at 10:25−11:1, 13:15–14:9, 17:17–18:6 (MDOC 30(b)(6) Dep. (Talcott)).

## IDENTIFICATION AND CLASSIFICATION OF DEAF AND HARD OF HEARING PRISONERS

3.  Before this lawsuit was filed in March 2015, MDOC had no statewide policy for identifying and classifying deaf and hard of hearing prisoners.  Ex. E, at 27:25–28:3, 37:6–14 (MDOC 30(b)(6) Dep. (Harbaugh)); Ex. F, at 69:7–70:4 (MDOC 30(b)(6) Dep. (Solomon)); Ex. G, at 14:1–15:4 (MDOC 30(b)(6) Dep. (Kerstein)).

4.  Before this lawsuit was filed, MDOC had maintained no comprehensive list identifying the deaf and hard of hearing prisoners in its custody.  Ex. F, at 41:12−42:14; 54:20−55:12, 60:11−15, 77:21−78:1 (MDOC 30(b)(6) Dep. (Solomon)); Ex. G, at 86:10–25 (MDOC 30(b)(6) Dep. (Kerstein)).

---

[1] Plaintiff Wittman has been released from prison and is currently on parole.  He was in MDOC custody prior to release.  *See, e.g.*, Ex. C, at 4−5 (Plaintiff Wittman's Objections and Responses to Defendants' First Set of Interrogatories, Response 1).

5.    Before this lawsuit was filed, MDOC had taken no systematic steps to transfer deaf and hard of hearing prisoners from facilities not designated to house them to facilities that are so designated.  Ex. H, at 82:9−16, 86:2−12 (MDOC 30(b)(6) Dep. (Gilbert)); Ex. G, at 15:5−9 (MDOC 30(b)(6) Dep. (Kerstein)).

6.    MDOC created a document which established MDOC guidelines for identifying deaf and hard of hearing prisoners and classifying their hearing loss, effective in April 2016.  This document is titled "Medical Service Advisory Committee – Guidelines," and has the subject "Guidelines for Hearing Impaired Accommodations and Classification."  Ex. I (Guidelines for Hearing Impaired Accommodations and Classification).

7.    MDOC's Guidelines for Hearing Impaired Accommodations and Classification state that "one hearing aid will be issued for prisoners with deficit in both ears of 26 decibels or greater, if recommended by audiologist."  Ex. I (Guidelines for Hearing Impaired Accommodations and Classification).

8.    MDOC maintains a health care services grid that identifies the health care services available at each MDOC facility.  Ex. J, Michigan Department of Corrections - Bureau of Health Care Services, Onsite

3

Health Care Services Grid.  The grid indicates which MDOC facility provides the health care service identified in each row.  *Id.*

9.    In the health care services grid, MDOC identified six facilities as offering services for "Vision/Hearing Impaired": SRF, DRF, JCF, SMT, WCC, and WHV.  *Id.*; Ex. K, at 16:22–17:3, 30:22–31:24 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

10.    MDOC houses prisoners with "severe and profound" hearing loss at facilities not identified on the MDOC health care grid as facilities designated for deaf and hard of hearing prisoners.  Ex. L (List of Deaf and Hard of Hearing Prisoners Attached as Exhibit 5 to Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification); Ex. H, at 35:25–36:7 (MDOC 30(b)(6) Dep. (Gilbert)); Ex. K, at 60:3–8 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

11.    MDOC provided a list of 200 deaf and hard of hearing prisoners in its custody on March 10, 2017 that identifies 84 deaf and hard of hearing prisoners housed at facilities not identified on the MDOC health care grid as facilities designated for deaf and hard of hearing prisoners. The same list indicates that 32 of the 82 deaf and hard of hearing prisoners that MDOC has classified as "hearing impaired with deficit" are housed at non-designated facilities.  Ex. L (List of Deaf and Hard

4

of Hearing Prisoners Attached as Exhibit 5 to Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification).

12. MDOC has established no standards or guidelines for what types of accommodations are necessary for an MDOC facility to be considered capable of housing deaf and hard of hearing prisoners. Ex. K, at 34:9–15 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

13. Paul Slagter is an employee of the MDOC. He was designated by MDOC as its 30(b)(6) witness with knowledge about numerous issues related to deaf and hard of hearing prisoners, including (1) MDOC's policies, procedures, and practices related to (a) communications devices and/or services for deaf and hard of hearing prisoners, and (b) access by deaf and hard of hearing prisoners to medical, educational, mental health, work, and religious programs or services, parole hearings, disciplinary proceedings and any other administrative hearings; (2) actions taken by MDOC in response to accommodation requests by deaf or hard of hearing prisoners; (3) MDOC's consideration of video relay services; and (4) cancellation of the contract with Linguistica International ("Linguistica") for American Sign Language ("ASL") interpreter services. Ex. K, at 8:13–9:7 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))); Ex. M, at 5:14–23

5

(MDOC 30(b)(6) Dep. (Slagter (October 13, 2016))); Ex. N, at 7–8 (Plaintiffs' Notice of Deposition Pursuant to Rule 30(b)(6)); Ex. O, at 7-8 (Plaintiffs' Notice of Supplemental Deposition of MDOC Pursuant to Rule 30(b)(6)).

14. Paul Slagter testified in his capacity as a 30(b)(6) representative of MDOC that (1) "[t]here is not a departmental policy directive" for accommodating deaf and hard of hearing prisoners, and (2) such a policy directive is "the only way we're going to be consistent in applying different practices throughout the department." Ex. K, at 68:9–12, 20–24 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

## TELECOMMUNICATIONS SERVICES AND AUXILIARY AIDS

15. Video-based communication is now the standard mode of remote communication for deaf and hard of hearing individuals who communicate through sign language. Ex. P, at 10–12 (Ray Expert Report); Ex. Q, at 46–48 (Cokely Expert Report); Ex. R, at MCBRIDE 1ST RTP 001991 (Email from Millicent Warren to Edward Mize).

16. Video-based communication allows deaf and hard of hearing individuals to communicate with hearing individuals through the

6

federal government-sponsored video relay service ("VRS").  Ex. P, at 11–12 (Ray Expert Report).

17. Through VRS, the deaf individual uses ASL via video with an interpreter, and the interpreter then interprets orally to the hearing individual on the call.  Ex. P, at 11–12 (Ray Expert Report); Ex. S, at MCBRIDE 236034 (Memo from Paul Slagter to Kenneth McKee re: Assessment of Video Relay Service (VRS) for the Deaf and Hard of Hearing).

18. Video-based communication also allows deaf and hard of hearing individuals to communicate directly with other deaf and hard of hearing individuals using ASL.  Ex. P, at 11–12 (Ray Expert Report); Ex. S, at MCBRIDE 236034-35 (Memo from Paul Slagter to Kenneth McKee re: Assessment of Video Relay Service (VRS) for the Deaf and Hard of Hearing).

19. Video-based communication may be monitored by prison staff for security purposes.  Ex. P, at 12–15 (Ray Expert Report); Ex. S, at MCBRIDE 236035 (Memo from Paul Slagter to Kenneth McKee re: Assessment of Video Relay Service (VRS) for the Deaf and Hard of Hearing).

20.    Video-based communication via VRS can be made available at
       MDOC facilities at no cost.  Ex. K, at 71:20–72:3 (MDOC 30(b)(6)
       Dep. (Slagter (April 11, 2016))); Ex. S, at MCBRIDE 236034 (Memo
       from Paul Slagter to Kenneth McKee re: Assessment of Video Relay
       Service (VRS) for the Deaf and Hard of Hearing); Ex. P, at 11–12
       (Ray Expert Report).

21.    MDOC has not made videophones available to deaf and hard of
       hearing prisoners at any of the MDOC facilities.  Ex. M, at 12:22–
       13:1 (MDOC 30(b)(6) Dep. (Slagter (October 13, 2016 ))).

22.    MDOC makes teletypewriters ("TTY") available to deaf and hard of
       hearing prisoners at certain facilities.  Ex. T, at 19−21 (Defendants'
       Response to Plaintiffs' First Set of Interrogatories, Response 6); Ex. U
       (List of MDOC TTYs).

23.    Fifty-five deaf and hard of hearing prisoners identified on MDOC's
       list of deaf and hard of hearing prisoners in its custody are housed at
       facilities that do not have TTYs.  Twenty-one deaf and hard of
       hearing prisoners identified as "hearing impaired with deficit" on
       MDOC's list of deaf and hard of hearing prisoners in its custody are
       housed at facilities that do not have TTYs.  Ex. L (List of Deaf and
       Hard of Hearing Prisoners Attached as Exhibit 5 to Defendants'

Response in Opposition to Plaintiffs' Motion for Class Certification); Ex. U (List of MDOC TTYs); Ex. K, 39:6−40:12 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

24. TTY is a 60-year old technology that allows a deaf or hard of hearing individual to type a message that a deaf or hard of hearing recipient may view if, and only if, the recipient also has a TTY. Ex. P, at 7–9 (Ray Expert Report); Ex. R, at MCBRIDE 1ST RTP 001989, 001991 (Emails between Paul Slagter, Millicent Warren, Daphne Johnson, and others).

25. Many deaf and hard of hearing individuals do not have TTYs. Ex. R, at MCBRIDE 1ST RTP 001989, 001991 (Emails between Paul Slagter, Millicent Warren, Daphne Johnson, and others); Ex. P, at 7 (Ray Expert Report); Ex. Q, at 4–5, 45–46 (Cokely Expert Report).

26. Because TTYs require typing and reading, they require proficiency in written English. Ex. P, at 7–8 (Ray Expert Report); Ex. Q, at 46-47 (Cokely Expert Report).

27. Many deaf and hard of hearing individuals lack proficiency in written English. Ex. P, at 5 (Ray Expert Report), Ex. Q, at 13–16, 37–38 (Cokely Expert Report); *see, e.g.*, Ex. V, at MCBRIDE 015762−64 (Excerpts from MDOC Prisoner Medical Records).

9

28. Many deaf and hard of hearing individuals use ASL.  Ex. P, at 5 (Ray Expert Report); Ex. Q, at 10-11, 13–16 (Cokely Expert Report).

29. ASL has its own structure, syntax, and grammar.  Ex. P, at 5 (Ray Expert Report); Ex. Q, at 10–12 (Cokely Expert Report).

30. Deaf and hard of hearing prisoners have requested videophones.  Ex. W (Wittman Grievance Document); Ex. X (McBride Grievance WHV-2013-03-1391-03F).

31. Paul Slagter notified another MDOC official in an email that "we are hearing locally from the prisoners . . . that [TTY] is outdated and the family members and the community no longer have the machines.  It would be comparable to sending someone a fax to their homes versus an email to communicate."  Ex. R (Email from Paul Slagter to Daphne Johnson); *see also* Ex. Y, at 9:13–16 (Slagter Dep.).

32. Until July 1, 2015, MDOC contracted with a single vendor, Linguistica, to provide ASL interpreter services at all MDOC prison facilities.  Ex. K, at 87:23–88:1, 89:7–10 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

33. Linguistica failed to consistently provide interpreters when they were requested by MDOC.  Ex. Z, at 64:24–65:8 (Reeves Dep.); Ex. AA, at 42:18–23 (MDOC 30(b)(6) Dep. (McKee)).

10

34.  MDOC terminated the contract with Linguistica on July 1, 2015.  Ex. BB (Memorandum from Kenneth T. McKee to Wardens re: Language Services).

35.  MDOC has not secured the services of a single, statewide provider of interpreter services to replace Linguistica.  Ex. K, at 88:8–14, 88:24–89:2 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

36.  MDOC instructed individual facilities to retain their own interpreter service providers via purchase order.  Ex. BB (Memorandum from Kenneth T. McKee to Wardens re: Language Services); Ex. K, at 102:20–24 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

37.  One MDOC facility did not retain a replacement provider of interpreter services until eight months after the Linguistica contract was canceled.  Ex. CC, at 78:9–19 (Campbell Dep.).

38.  MDOC has relied on fellow prisoners to interpret for deaf and hard of hearing prisoners, including at medical appointments.  *E.g.*, Ex. DD (Grievance WHV-11-11-4704-06C); Ex. EE, at MCBRIDE 014420, MCBRIDE 014451 (Excerpts from MDOC Prisoner Medical Records); Ex. V, at MCBRIDE 015550-51 (Excerpts from MDOC Prisoner Medical Records); Ex. CC, at 52:19–53:6, 78:14–22 (Campbell Dep.); Ex. FF, at 69:11−16 (Brewer Dep.).

11

39.     MDOC has relied on lip-reading and "pen and paper" to attempt to communicate with deaf and hard of hearing prisoners, including at medical appointments. *E.g.*, Ex. CC, 52:19–53:6 (Campbell Dep.); Ex. EE, at MCBRIDE 021247 (Excerpts from MDOC Prisoner Medical Records); Ex. V, at MCBRIDE 015111, MCBRIDE 015167; MCBRIDE 015350, MCBRIDE 015395−96, MCBRIDE 015762−64 (Excerpts from MDOC Prisoner Medical Records); Ex. EE, at MCBRIDE 014179−80 (Excerpts from MDOC Prisoner Medical Records); Ex. HH, at MCBRIDE 021791−92 (Excerpts from MDOC Prisoner Medical Records); Ex. II, at MCBRIDE 012773 (Excerpts from MDOC Prisoner Medical Records);  Ex. JJ, MCBRIDE 051586−87 (Excerpts from MDOC Prisoner Medical Records); Ex. KK (Grievance JCF-13090-1609-12Z1).

40.     Skilled lip readers can recognize only approximately 10-30% of words.  Ex. Q, at 16–19 (Cokely Expert Report); Ex. P, at 5 (Ray Expert Report).

41.      A July 20, 2015 memorandum from MDOC's Deputy Director for the Correctional Facilities Administration, Kenneth McKee, to MDOC wardens ("McKee Memo") listed certain situations when foreign language and ASL services should be provided.  Ex. BB

(Memorandum from Kenneth T. McKee to Wardens re: Language Services).

42. The McKee Memo does not establish any specific procedures to ensure that interpreters are available. *Id.*

43. MDOC has not taken any steps to monitor or verify whether its facilities are complying with the McKee Memo. Ex. AA, at 35:8–18, 36:4–10 (MDOC 30(b)(6) Dep. (McKee)).

44. Apart from the McKee Memo, MDOC has no other system-wide policies or procedures that address the provision of ASL interpreter services. Ex. K, at 95:4−7 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))); Ex. T, at 15−19 (Defendants' Response to Plaintiffs' First Set of Interrogatories, Response 5); Ex. LL, at 4−5 (Defendants' First Supplemental Response to Plaintiffs' First Set of Requests for Production, Response 13).

45. The McKee Memo does not require that MDOC provide interpreters in connection with religious services. Ex. AA, at 61:14–17 (MDOC 30(b)(6) Dep. (McKee)); Ex. K, at 105:3–19 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

46. MDOC does not provide ASL interpreters at religious services. Ex. K, at 105:3–25 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

13

47.    MDOC does not try to accommodate requests by prisoners for ASL interpreters at religious services.  Ex. K, at 105:20–22 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))).

48.    Prisoners in MDOC's custody have repeatedly not had ASL interpreters available for medical appointments.  *E.g.*, Ex. MM, at MCBRIDE 021209 (Excerpts from MDOC Prisoner Medical Records); Ex. GG, at MCBRIDE 021247 (Excerpts from MDOC Prisoner Medical Records); Ex. NN, at MCBRIDE 020910 (Excerpts from MDOC Prisoner Medical Records); Ex. OO, at MCBRIDE 020908 (Excerpts from MDOC Prisoner Medical Records); Ex. PP, at MCBRIDE 020871 Excerpts from MDOC Prisoner Medical Records); Ex. QQ, at MCBRIDE 020779 (Excerpts from MDOC Prisoner Medical Records); Ex. II, at MCBRIDE 013047, MCBRIDE 013202 (Excerpts from MDOC Prisoner Medical Records); Ex. EE, at MCBRIDE 013986, MCBRIDE 014045, MCBRIDE 014179−80 (Excerpts from MDOC Prisoner Medical Records; Ex. V, at MCBRIDE 015167, MCBRIDE 015882, MCBRIDE 015395−96 (Excerpts from MDOC Prisoner Medical Records); Ex. RR, at MCBRIDE 033986 (Excerpts from MDOC Prisoner Medical

Records); Ex. JJ, at MCBRIDE 051586−87 (Excerpts from MDOC

Prisoner Medical Records).

49.    Video remote interpreting ("VRI") involves remote ASL interpreters

accessible by video.  Ex. P, at 23−24 (Ray Expert Report).

50.     VRI can be especially beneficial in emergency situations.  *Id.*; *see*

*also* Ex. Q, at 51−52 (Cokely Expert Report).

51.    MDOC previously offered access to VRI at the Women's Huron

Valley Correctional Facility ("WHV") and the G. Robert Cotton

Correctional Facility ("JCF") as a "beta test," but MDOC has

discontinued this program.  Ex. K, at 91:10-93:9, 94:3−7 (MDOC

30(b)(6) Dep. (Slagter (April 11, 2016))).

## NOTIFICATION OF PRISON WARNINGS AND ANNOUNCEMENTS

52.    MDOC does not ensure at the central level that systems of visual

notification for announcements and safety alerts, such as fire alarms

and alarms signaling emergency lockdowns, are accessible to deaf and

hard of hearing prisoners at every MDOC facility where such

prisoners are housed.  Ex. K, at 110:14–112:9, 123:16–21 (MDOC

30(b)(6) Dep. (Slagter (April 11, 2016))).

53.    Not all MDOC facilities that house deaf or hard of hearing prisoners

provide in-cell visual alarms.  Ex. T, at 21–23 (Defendants' Response

15

to Plaintiffs' First Set of Interrogatories, Request 7); Ex. K, at 110:14–25, 112:10−19 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016)));  Ex. P, at 19 (Ray Expert Report); Ex. Q, at 38−39 (Cokely Expert Report).

54.   In-cell visual alarms or bed shakers are necessary in the event of a fire or other emergency that occurs while deaf and hard of hearing prisoners are sleeping, given their likely inability to hear an aural alarm.  Ex. P, at 18−20 (Ray Expert Report); Ex. Q, at 38−39 (Cokely Expert Report).

55.   MDOC does not ensure that  systems of visual notification are made available for daily activities such as meal time and count time at all facilities that house deaf and hard of hearing prisoners, and does not consistently provide such visual notification.  Ex. T, at 21–23 (Defendants' Response to Plaintiffs' First Set of Interrogatories, Request 7); Ex. K, at 111:1–22 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))); Ex. CC, at 80: 14−23 (Campbell Dep.).

56.   MDOC implemented a Page Alert Broadcast System pilot program at one facility involving a one-way communication system that allows MDOC employees to send messages to pagers issued to deaf and hard of hearing prisoners, and is rolling out this system at four of the other facilities designated for deaf and hard of hearing prisoners.  Ex. SS, ¶

16

5 (Affidavit of Paul Slagter, Attached as Exhibit 10 to Defendants'

Response in Opposition to Plaintiffs' Motion for Class Certification);

Ex. TT (WHV Operating Procedure: Assistive Listening Devices and

Page Alert Broadcast System); Ex. M, at 67:21−68:12 (MDOC

30(b)(6) Dep. (Slagter (October 13, 2016))).

57.    The pagers provided to prisoners at the pilot facility, WHV, have not

worked consistently, resulting in information gaps.  Ex. A, at 11−12

(Plaintiff McBride's Objections and Responses to Defendants' First

Set of Interrogatories, Responses 6−7); Ex. K, at 116:25−117:5,

119:14−120:1 (MDOC 30(b)(6) Dep. (Slagter (April 11, 2016))); Ex.

Z, at 92:18−23 (Reeves Dep.); Ex. Q, at 40 (Cokely Expert Report).

## TREATMENT OF DEAF AND HARD OF HEARING PRISONERS

58.    MDOC has received multiple complaints related to the mistreatment

of deaf and hard of hearing prisoners by prison employees.  *E.g.*, Ex.

UU (Grievance WHV-2014-06-2356-06E); Ex. VV (Grievance URF-

1406-1931-17a); Ex. EE, at MCBRIDE 014062 (Excerpts from

MDOC Prisoner Medical Records).

59.    Plaintiff McBride filed a grievance stating that she was verbally

"degrad[ed]" and "humiliated" by an officer who mocked Ms.

17

McBride's manner of speaking.  Ex. UU, at MCBRIDE 235409−12 (Grievance WHV–2014–06–2356–06E).

60.   The grievance stated that the officer shouted at Ms. McBride despite being informed by other prisoners that Ms. McBride was deaf, and could not hear the officer's instructions.  *Id.* at MCBRIDE 235409–11, 235413–14.

61.   Ms. McBride's grievance included supporting statements from eight eyewitnesses.  *Id.* at MCBRIDE 235413–23.

62.   One supporting statement from an eyewitness stated that a senior officer observed the exchange, but did not intervene.  *Id.* at MCBRIDE 235415.

63.   MDOC responded to Ms. McBride's grievance by saying, "[McBride] is unaware of what comments and statements [were] being made due to there was no interpreter present.  There fore (sic) grievance is denied due to insufficient evidence."  *Id.* at MCBRIDE 235424.

## TRAINING RELATED TO TREATMENT AND ACCOMMODATION OF DEAF AND HEARD OF HEARING PRISONERS

64.   MDOC has no system-wide policies or procedures that address training related to the treatment of or accommodations for deaf and hard of hearing prisoners.  Ex. WW, at 14:25–15:3 (MDOC 30(b)(6)

Dep. (Czinder (April 13, 2016))); Ex. XX, at 9:16–21 (MDOC

30(b)(6) Dep. (Czinder (October 12, 2016))); Ex. Z, at 144:20−23,

149:10–15 (Reeves Dep.); Ex. CC,  at 53:7–10 (Campbell Dep.).

65.    At a system-wide level, MDOC does not provide training that

addresses treatment of or accommodations for deaf or hard of hearing

prisoners.  Ex. WW, at 25:16–25 (MDOC 30(b)(6) Dep. (Czinder

(April 13, 2016))); Ex. XX, at 9:16–10:12 (MDOC 30(b)(6) Dep.

(Czinder (October 12, 2016))).

66.    At a system-wide level, MDOC does not provide training on issues

related to identification and classification of deaf and hard of hearing

prisoners.  Ex. WW, at 26:23–27:1 (MDOC 30(b)(6) Dep. (Czinder

(April 13, 2016))).

67.    At a system-wide level, MDOC does not provide training on the use

and maintenance of TTYs.  *Id.* at 27:2–7.

68.    At a system-wide level, MDOC does not provide training on access to

ASL interpreters.  *Id.* at 26:19–22.

69.    At a system-wide level, MDOC does not provide training on visual

systems of notification for alarms and announcements.  *Id.*  at 34:22–

35:3.

70.   At a system-wide level, MDOC does not provide training on the needs of deaf and hard of hearing prisoners in emergencies. *Id.* at 35:4–22.

71.   MDOC does not have any plans to provide training or education regarding the treatment of or accommodations for deaf and hard of hearing prisoners. *Id.* at 38:10–13 (MDOC 30(b)(6) Dep. (Czinder (April 13, 2016)); Ex. XX, at 10:13–16 (MDOC 30(b)(6) Dep. (Czinder (October 12, 2016))).

## **PLAINTIFFS' EXPERTS**

72.   Dr. Cokely is a tenured professor of ASL and Modern Languages at Northeastern University, and has 48 years of experience with deaf individuals. Ex. Q, at 1 (Cokely Expert Report).

73.   Mr. Ray, who is deaf, has been employed by the City of Los Angeles Department of Disability for the past 23 years to assess, monitor, and ensure the city's compliance with the ADA, Rehabilitation Act, and other disability laws. Ex. P, at 1–3 (Ray Expert Report).

74.   Dr. Cokely found that MDOC denies meaningful and effective communicative access for deaf and hard of hearing prisoners, and denies them access to services, programs, and benefits that are afforded to other prisoners. Ex. Q, at 3 (Cokely Expert Report).

75.    Mr. Ray found that MDOC fails to provide deaf and hard of hearing
prisoners with the means to communicate effectively with individuals
both inside and outside of MDOC, to receive important
announcements, and to have equal access to prison facilities,
programs, services, and activities.  Ex. P, at 4 (Ray Expert Report).

76.    Both experts conclude that MDOC must, at minimum, provide the
following accommodations to reasonably accommodate deaf and hard
of hearing prisoners: (1) access to videophones; (2) consistent access
to qualified sign language interpreters; (3) in-cell visual alarms and/or
notification systems at all facilities that house deaf and hard of
hearing prisoners; and (4) training to ensure MDOC staff understand
how to interact appropriately with deaf and hard of hearing prisoners.
Ex. Q, at 3–6 (Cokely Expert Report); Ex. P, at 4–5, 26 (Ray Expert
Report).

77.    Dr. Cokely further concludes that a review of all MDOC policies and
procedures, with appropriate modifications where warranted, is
necessary to ensure that deaf and hard of hearing prisoners are not
systematically disadvantaged relative to prisoners who are not deaf or
hard of hearing.  Ex. Q, at 54 (Cokely Expert Report).

21

Dated: March 17, 2017                          Respectfully submitted,


                                               /s/ Andrew D. Lazerow
                                               Andrew D. Lazerow
                                               Stephen C. Bartenstein
                                               Philip J. Levitz
                                               Covington & Burling LLP
                                               One CityCenter
                                               850 Tenth Street, NW
                                               Washington, DC 20001
                                               (202) 662-6000

                                               *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 17, 2017, I caused a true and correct copy of

the foregoing **Statement of Material Facts Not in Dispute** to be served on all

counsel of record via ECF.

/s/ Andrew D. Lazerow
*Attorneys for Plaintiffs*